KEARNEY, Respondent, vs. MASSMAN CONSTRUCTION COMPANY and others, Appellants.

*March 15—May 1, 1945.*

58

For the appellants there were briefs by *Quarles, Spence & Quarles,* attorneys, and *Edward H. Borgelt* and *Ralph M. Hoyt* of counsel, all of Milwaukee, and oral argument by *Mr. Hoyt.*.

For the respondent there was a brief by *Rubin, Zabel & Ruppa,* attorneys, and *William B. Rubin* of counsel, all of Milwaukee, and oral argument by *William B. Rubin.*

MARTIN, J.   Appellants contend : ( 1 ) That if an angle iron came down the pipe chase and hit the plaintiff, any one of six people could have caused its fall; ( 2 ) that it would have been impossible for an angle iron the size of the one in question to have thread its way through the openings through the four floors; ( 3 ) that there is a complete lack of credible evidence that plaintiff was hit by an angle iron at all; ( 4 ) that the specific act of negligence found by the trial court is not established by any evidence; ( 5 ) that under the credible evidence

the judgment must be grounded either upon a story which negatives liability or upon mere speculation and conjecture; and (6) that the damages awarded are grossly excessive.

The case having been tried to the court, we are not at liberty to change the findings unless they are contrary to the great weight and clear preponderance of the evidence. This is an elementary rule which requires no citation of authorities.

Appellants' reference to any one of six people who could have caused the angle iron to fall as found by the trial court includes the four guards who, at the time, were on duty on their respective floors, and the two electricians who were working on the fifth floor. The four guards were employees of the United States Rubber Company; the two electricians were employees of the defendants. Plaintiff was guard on the first floor. A man named Nielson was guard on the second floor; Erwin Hoffman, on the third floor; Fred J. Pfister, on the fourth floor; and Leroy H. Zellmer, on the fifth floor. Nielson was not a witness; he could not be located at the time of the trial.

Zellmer, the fifth-floor guard, testified that the two electricians and himself were the only ones on the fifth floor; that the two electricians were working around the section of the floor where the opening was; that the electricians' platform was not very far from the opening; that he was probably fifteen feet from the opening, eating his lunch at the time; that when he had about finished his lunch he heard someone say, "Look out below," or "Duck your head;" that he then looked down and saw plaintiff on the first floor; that the two electricians left his floor; that while he was eating lunch the two electricians were within fifteen feet of him; that he heard plaintiff holler for help from the first floor; that there were angle irons around there on the fifth floor.

Pfister, guard on the fourth floor, testified that at the time of the accident he was standing right by the pipes; that he was looking down to the first floor and someone said, "Get

your head out of there;" that the next thing he heard was Mr. Kearney's holler for help.  He testified:

"*Q*. Who did you hear holler 'Put your head back?' *A*. Well, someone on the fifth floor.  And I knew it wasn't the guard, because I knew his voice, and he had just left a few seconds before that.

"*Q*. What happened after you heard him say, 'Pull your head back?'  *A*. Well, something went past me.  I don't know what it was.  It went so fast."

Hoffman, guard on the third floor, testified that he was on the third floor about twenty-five feet from the opening, near the elevator when he heard somebody call, "Please help me, somebody;" that it sounded like it came from the opening; that he rushed over there and saw Mr. Kearney on the floor with his arms around a pipe and bleeding; that he called to the guard on the second floor to go down and help; that he went down to the first floor and the two electricians came down at approximately the same time; that he had them take Mr. Kearney over to the hospital across the road; that he told the men at that time not to touch anything that was on the floor; that there was an angle iron there.  He testified:

"*Q*. Did anybody attempt to pick up the angle iron? *A*: Well, I told the boys, the electricians, that they couldn't touch anything, that it would have to be left right there.

"*Q*. Did anybody try to pick it up?  *A*. Well, the electricians came in and went for that angle iron, and I told them not to touch it."

He further testified that he was down on the first floor when the electricians came down; that the angle iron was lying right at the opening; that one of the electricians bent down and wanted to pick it up and he said, "Don't touch anything;" that he then said, "Did that come down?  Did you throw it down?" and the electrician said, "No, it fell down;" that the electrician said it fell down from the fifth floor.

The openings in the floors were five feet in length and nine inches in width. These openings were surrounded by a concrete curb raised six inches above the floor level. The angle iron in question was one and one-half inches wide and twenty inches long.

Lincoln Freuck, the foreman electrician, examined adversely, testified that he and Thorson were working on the fifth floor at the time of the accident; that they were the only ones working that night on any floor; that they were the only two, outside of the guards, on the premises; that they knew the guards were using the pipe chase for intercommunication; that there were angle irons all over the building; that they used the angle irons for bracing, putting brackets on the wall; that in performance of the electric work he and his fellow electrician had to push their work platform around to different places on the floor; that they had to do some electric work near the hole in the fifth floor; that they were moving about a platform five feet wide, eight feet long, and five feet high, on casters; that in moving the platform they passed right next to the hole. He testified:

"*Q.* Well, as a matter of fact, when you pushed that horse [platform] you went right close by the opening, did you not? *A.* Yes, we had to; there was only a small space to move by.

"*Q.* And as you passed by you could see the opening, couldn't you? *A.* Oh, sure, if you looked that way you could see it.

"*Q.* Now isn't it a fact that you heard someone holler for help after you had stopped pushing the horse, or the platform? *A.* Well, it must have been after we stopped pushing, because while you were moving that you couldn't hear anything besides. . . .

"*Q.* I am asking you now, did you testify before Court Commissioner Quick that you saw the angle iron? *A.* All right, I did.

"*Q.* And was that angle iron the same as angle irons that were on the fifth floor that night? *A.* Well, those angle irons were all over the building. . . .

"*Q*. As you pushed your wagon [platform] from place to place you sometimes ran into one of those? *A*. Not usually. They were usually kept out of the way. Sometimes they were lying on the floor.

"*Q*. Sometimes they were lying on the floor and you ran into them, is that right? *A*. Yes."

He further testified that they brought the platform to a stop within a couple of feet from the opening; that it was about that time he heard someone call for help; that "that is where we happened to be when we heard of the accident."

Lawrence Thorson, the other electrician, testified that he and Freuck were the only ones on the fifth floor, the only ones in that building that night on any floor; that "we saw no one else at the time we heard the call for help;" that he saw no one after the call for help except the guard and he was fifty feet away from the shaft at the time; that at no time did he see the guard near the shaft; that while in the act of moving the scaffold he heard a call that someone was hurt; that he was pulling, guiding, looking at the scaffold, pulling backward; that the shaft was north of where the scaffold was and they were pushing it toward that direction; that he didn't pay any particular attention to angle irons on the floor, there were none where he was working.

There is expert testimony as to the possibility of an angle iron, the size of the one here in question, falling through the openings in the four floors. All openings were in a direct line. The defendants' witness experimented three times with an angle iron on the fifth floor and was unable to get the iron to drop into the opening at all from a height of six or eight feet above the floor; it turned sideways immediately after the commencement of its vertical drop and either remained on the fifth floor or bounced from that floor into the hole at an angle which forced it off to the side before it reached the fourth floor. He explained that this was due to certain laws of physics.

Plaintiff's expert testified that he made numerous experiments; that in twenty times that the angle iron actually fell into the well, various floors on which the iron was knocked off were recorded, and seven out of twenty times it went all the way down to the basement. He further testified that in dropping such a piece of iron in a free fall the wind or air would have practically no effect; that in dropping a piece of iron in a free fall it tends to rotate; that in terms of physics, an object will always tend to rotate about the position in which its movement of inertia is at a minimum. But, more persuasive and controlling is the fact as found by the trial court that the angle iron did fall from the fifth floor and struck plaintiff on the first floor.

Plaintiff testified that the two electricians were the only ones in the building, excepting the guards; that the electricians were working on the fifth floor; that he communicated with the guards on the floors above through the openings; that he was about to communicate with the guard on the second floor when the angle iron came down and struck him on the head; that it dropped him to the floor; that he hollered for help; that a guard and the two electricians came down; that Electrician Freuck said, "I'm sorry that I dropped this angle iron; it's mine;" that the other electrician said, "We got to use this for brackets;" that he was then taken to the field hospital.

To establish liability, plaintiff must prove: (1) That the angle iron which caused his injury came from the fifth floor; and (2) that its fall from that floor was due to the negligence of the defendants' employees who were working there. The electricians were employees of the defendant subcontractors and were bound to refrain from acts of negligence which might cause injury to others lawfully upon the premises. The electricians had knowledge that the pipe chase was used for intercommunication, and that someone was likely to be in and around said pipe chase on the floors below. If, in the

performance of their duties, they caused the angle iron to drop from the fifth floor through the pipe chase, it was an act of affirmative negligence for which defendants would be liable. See *Taylor v. Northern Coal & Dock Co.* 161 Wis. 223, 229, 152 N. W. 465; *Cermak v. Milwaukee Air Power Pump Co.* 192 Wis. 44, 50, 211 N. W. 354. In the *Cermak Case, supra,* plaintiff was injured through the negligence of an employee of a third party who caused an iron pipe under his control to strike plaintiff in the head. At page 50 the court said, quoting from the *Taylor Case, supra:*

"Under the decisions of this court the defendant was bound to refrain from acts of affirmative negligence."

Continuing, the court said:

"The plaintiff alleges that his injury was caused by one acting for the defendant who carelessly and negligently struck the plaintiff in the back of the head with an iron pipe. This was an act of 'affirmative negligence' which makes the defendant answerable in damages for such injury." Citing the *Taylor Case, supra,* and *Hupfer v. National D. Co.* 114 Wis. 279, 284, 90 N. W. 191.

It is not incumbent upon the plaintiff to prove the precise manner in which the angle iron fell or was dropped in the pipe chase.

Appellant argues that the trial court based its decision on the rule of *res ipsa loquitur,* and cites many cases from this jurisdiction to show that the rule does not apply in the instant case. We agree with counsel that the rule is not applicable to the facts in the instant case. Plaintiff does not rely on the rule of *res ipsa loquitur;* and while, in its decision, the trial court cites certain cases based on that rule, we think it clear that the trial court based its findings of negligence on the rule stated in the *Taylor* and *Cermak Cases, supra.*

We cannot say that the finding of causal negligence is against the great weight and clear preponderance of the evidence.

Appellant contends that the damages awarded are excessive. The damages are high. No question is raised as to the item of $521.09 for medical expenses or $1,155 for loss of wages between the time of the accident and the time of the trial. The award of $15,000 for pain and suffering and future wage loss is vigorously challenged. That plaintiff sustained serious and permanent injuries is clearly established by the evidence. When injured he was thirty years of age, married, had one child. During school days he played football, basketball, and track, and won some medals. At the age of sixteen the little finger on his left hand was amputated at the third joint due to an accident. He was hospitalized on two occasions for asthma or hay fever, was otherwise in good health. He had no particular trade, did some painting. He worked at many different jobs. He was hospitalized at St. Joseph's Hospital and later at Columbia Hospital. X rays were taken.

Dr. David Cleveland, who has specialized in surgery of the nervous system since 1930, interpreted the X rays as showing two fractures of the skull; one, on the left side, two and one-half inches long; the other, on the right side, one and three-fourths inches long. Dr. Cleveland examined plaintiff on February 9, 1944. He found plaintiff's blood pressure above normal; pulse regular. Plaintiff swayed slightly when attempting to hold the Romberg position, that is, standing erect with feet together, toes and heels, and eyes closed; the normal reaction is a steady posture. On pressure with finger, there was skull tenderness to the left of the midline in the frontal parietal region. There was a marked nystagmus on looking far to the left, more marked when looking far to the right, with quick component in the direction of the gaze; that is, when he looked to the right, instead of his eyes staying in a

fixed position they oscillated back and forth. It is an abnormal condition usually due to either a vestibular disturbance, that is part of the function of the brain, or to a cerebellar ataxia, which is loss of co-ordination of the hind part of the brain. The doctor testified that the injuries were caused by the blow plaintiff received on the head from the falling angle iron. The doctor was asked:

"*Q.* And what association do you make between the physical findings and the injury to the skull? *A.* I would say that they are the result of the injury to the skull—brain."

He further testified:

"I believe the nystagmus and the slight swaying of the Romberg position are more or less permanent, probably permanent. I believe the headaches are the result of the injury. Patients who have post-traumatic headaches very frequently complain that noises aggravate the headaches. Nervousness is a frequent complication following injury. The patient is aggravated by things that normally wouldn't disturb him. There is frequently a disturbance in memory following head injury. My opinion is that the nystagmus is a permanent condition. I am unable to put any great significance or classify the tremor of the hands, but I believe the swaying is more or less of a permanent condition; it is permanent."

All of the medical witnesses agree that the nystagmus is permanent and that it could have been caused by the blow which produced the skull fractures. Dr. Malloy originally attended plaintiff. When he entered the army, Dr. Fechter attended plaintiff. He first saw plaintiff at his office on October 1, 1942. He saw him quite often thereafter until February 22, 1944. The doctor testified that when he first saw plaintiff he complained of severe headaches, dizzy spells, and appeared very nervous, said he couldn't sleep; that on October 7, 1942, he sent him to St. Joseph's Hospital for an X ray; that he was given a report by the hospital, assumed

the report to be correct, and diagnosed the case as skull fracture and brain concussion; that in plaintiff's various visits he complained of severe headaches, dizziness, couldn't sleep, and couldn't keep his balance; that "I told him to try and see if he couldn't work. He would come in and say, 'Well, I had to quit. I can't work.' Because of severe headaches that he would get;" that plaintiff reported quite steadily to him; that the reports were about the same all the time, severe headaches and the same symptoms; that he recommended that plaintiff see a specialist; that some of the things might be permanent, for instance, plaintiff's inability to keep his balance; that he assumed that all of the complaints originated with the accident of August 7, 1942.

All of the medical testimony is to the effect that plaintiff can, or should be able to, work. They find no objective symptoms that should interfere with performing ordinary labor. However, severe headaches, nervousness, irritability, difficulty in sleeping, impairment of memory, and attacks of dizziness are in the field of subjective symptoms. Those are matters hard to disprove, the actual existence of which rests almost entirely on the truthfulness of the patient. Plaintiff testified that when he gets a job he cannot keep it because of his condition; that he cannot stand noise; that he is afraid of crowds; that he has fallen at different times due to his nystagmus; that he runs into things; that his memory has been impaired; that at times he cannot get up, and at times cannot hold a cup of coffee in his hand.

While the award of $15,000 for pain and suffering and future wage loss is high, if the trial court believed the plaintiff's condition to be as he claimed it, and further believed that this condition was caused by the physical injuries sustained in the accident, we cannot say that the findings and award are against the great weight and clear preponderance of the evidence.

*By the Court.*—Judgment affirmed.