CRYE, Plaintiff, v. MUELLER and others, Defendants.
[Two appeals.]

*April 7—May 5, 1959.*

For the plaintiff there was a brief and oral argument by *Ted C. Boyle* and *Richard E. Lent,* both of Madison.

For the defendants Herbert C. Mueller, California Packing Corporation, and California Packing Sales Company, Inc., there were briefs by *Aberg, Bell, Blake & Metzner,* and *Carroll Metzner* and *Milo G. Flaten,* all of Madison, and oral argument by *Carroll Metzner.*

For the defendant Travelers Indemnity Company there were briefs by *Rieser, Stafford, Lesselyoung & Rosenbaum,*

and oral argument by *Robert W. Smith* and *Willard S. Stafford,* all of Madison.

DIETERICH, J. The defendant tractor driver, Mueller, stated the accident occurred just as the Robinson car entered the intersection and Leonard Crye stated that it occurred just north of the center of the intersection and slightly to the east. The defendant Robinson made no statement as to the point of impact.

*Lookout as to Robinson.*

The testimony of Robinson is that he was not going over 25 miles per hour as he approached the incline. The defendant tractor driver, Mueller, placed Robinson's speed at 50 miles per hour as he came into the partially obstructed intersection. There was also testimony of two witnesses who estimated the speed of the Robinson car at 50 to 60 miles per hour. The testimony of Mueller as to the speed of the tractor pulling the two wagons was that he was driving between 10 and 15 miles per hour. The tractor was controlled by a governor. Mueller stated that when he got within 30 feet of the intersection he had a vision of the WIBU road of approximately 180 feet and that when he observed the Robinson car he stepped on the brakes and pushed the clutch. He said he was trying to stop and could see he was not going to stop, and the next thing he knew they hit. The right front wheel of the tractor and the left front wheel of the Robinson car were the points of contact.

At the trial, Robinson testified as follows:

"Q. Would you tell the jury just what you recall about that accident? A. Oh well, after we were, you know, approaching this incline there, why,—well, I wasn't driving fast, not over 25 miles an hour, I would say probably not even that, because I don't drive fast anyway; but anyway I always look to my left, and in this case I did, and I figured—

well, I never noticed this fellow at all until—and evidently Mr. Crye was kind of blocking my view, because if I remember right I just, you know, looked to my right and Whang! He said, 'Look out,'—and that was it. As far as I know, I could see this tractor right beside me, see, at the time. . . .

"*Q*. You entered the intersection, and I take it you never saw this tractor at any time, is that right? *A*. That is right.

"*Q*. As you came up to the intersection which way were you looking, looking right or left? *A*. Right, I imagine.

"*Q*. The first lane of traffic you had crossed would be coming from your left, wouldn't it, but you were looking to your right? *A*. I had already looked to my left, if I remember right, and I just looked like this, and Mr. Crye says —and that was it.

"*Q*. What did you see when you looked to your left? *A*. The tractor.

"*Q*. How close was the tractor? *A*. Right on top of me."

Leonard C. Crye testified:

"*Q*. . . . will you tell the jury exactly what happened . . . ? *A*. The only thing I know, that I seen the tractor coming and I hollered to Mr. Robinson to look out. . . .

"*Q*. And you say as you approached the intersection you saw a tractor coming, and you hollered 'Look out?' *A*. Yes, sir.

"*Q*. And what did Mr. Robinson do, or was he able to do anything? *A*. That I don't know. I think he tried to put on his brakes and things,—I am not sure."

A special verdict consisting of five questions was submitted to the jury. The jury found that Lyall Robinson (1) was negligent in the operation of his motor vehicle, (a) with respect to lookout, and then added, contrary to the instructions of the court, 25 per cent; (2) that such negligence on the part of Lyall Robinson was a cause of the accident and added, contrary to the instructions of the court, 25 per cent; (3) that Herbert Mueller was negligent in the operation of his tractor, (a) with respect to lookout, and

then added, contrary to the instructions of the court, 75 per cent; that Herbert Mueller was negligent in the operation of his tractor, (b) with respect to yielding right of way, and then added, contrary to the instructions of the court, 75 per cent; (4) that such negligence on the part of Herbert Mueller was a cause of the accident, (a) with respect to lookout, and (b) yielding right of way, and the jury added, contrary to instructions of the court, 75 per cent; (5) (a) that the sum of $550 would reasonably compensate Leonard C. Crye for damages he sustained for medical and hospital expenses, (b) the sum of $3,950 for loss of earnings to date, and, (c) the sum of $7,900 for personal injuries.

The trial court then asked the jury the following question: "Members of the jury, was that and is that your verdict?" and the jurors answered "Yes." The court stated: "Before the court receives the verdict, I will entertain any position by counsel with reference to it." After hearing counsel and after consultation, the trial court stated: "You have before you, counsel, proposed supplemental instructions. I propose to reinstruct the jury as indicated in the proposed supplemental instructions, and I believe I also left with you a copy of the amended special verdict. Is there any comment by counsel? There being none, we will call the jury." Thereupon, the jury was recalled to the courtroom and the court stated, "Members of the jury: The court is submitting to you a form of amended special verdict with the identical questions submitted in the original form of special verdict. You will simply answer the questions submitted in the light of the court's instructions without notation or comment. The questions as to negligence and causation should be answered simply 'Yes' or 'No' as I instruct you. The questions as to damages should be answered simply by inserting the amount which you find and determine. That's all. I shall reread the instructions."

The amended special verdict was as follows:

"Question No. 1: At and immediately prior to the collision was Lyall Robinson negligent in the operation of his motor vehicle in respect to:

"(a) Lookout?

"Answer: No.

"Question No. 2: If you answered 'Yes' to subdivision (a) of question No. 1, then answer the following question: Was such negligence on the part of Lyall Robinson a cause of the accident?

"Answer: ———

"Question No. 3: At and immediately prior to the collision was Herbert Mueller negligent in the operation of his tractor in respect to:

"(a) Lookout?

"Answer: Yes.

"(b) Yielding right of way?

"Answer: Yes.

"Question No. 4: If you answered 'Yes' to any of the subdivisions of question No. 3, then answer each corresponding subdivision of the following question: Was such negligence on the part of Herbert Mueller a cause of the accident in any of the following respects:

"(a) As to lookout?

"Answer: Yes.

"(b) As to yielding right of way?

"Answer: Yes.

"Question No. 5: What sum will reasonably compensate Leonard C. Crye for the damages he has sustained:

"(a) For medical and hospital expenses?

"Answer: $550.

"(b) For loss of earnings to date?

"Answer: $3,950.

"(c) For personal injuries?

"Answer: $7,900."

It appears from the record that all defense counsel and plaintiff's counsel were satisfied as to the court's procedure in reinstructing the jury and in obtaining answers in the proper form to the questions submitted upon amended special verdict.

The usual motions after verdict were made, and the defendants Mueller and California Packing Corporation having also moved in the alternative that the answers of the jury to question No. 1 relative to defendant Robinson's negligence as to lookout be changed from "No" to "Yes," and that question No. 2 be answered "Yes." The lower court granted the motion and held that Robinson was negligent as to lookout as a matter of law, and that such negligence as to lookout was a substantial factor in producing the collision.

Robinson seeks to excuse his failure to make a more-efficient observation upon the ground that his view was somewhat obstructed to the west or left. We do not find it necessary to agree or disagree in this contention. "The operator of an automobile is obliged to make an *efficient* lookout to avoid striking an approaching vehicle whether the vehicle be moving toward him or crossing his path. This is his duty even though the dominant cause of an ensuing collision be the conduct of the other driver." *Bailey v. Zwirowski* (1954), 268 Wis. 208, 211, 67 N. W. (2d) 262; *Cherney v. Simonis* (1936), 220 Wis. 339, 265 N. W. 203; *Canzoneri v. Heckert* (1936), 223 Wis. 25, 269 N. W. 716.

Robinson in his testimony said he had looked to the left and even if he had not seen the approaching tractor at that time he was still under the obligation to look again to see whether another vehicle might be competing to cross the intersection. " 'One must look at a point where his observation will be efficient for protection.' *Thieme v. Weyker* [1931], 205 Wis. 578, 580, 238 N. W. 389. One may not drive recklessly into a zone of possible danger and then, after he has been injured or has caused injury, be heard to say that a condition or circumstance that he did not see or look for might possibly have excused his conduct. *Neuser v. Thelen* [1932], 209 Wis. 262, 244 N. W. 801; *Whyte*

*v. Lindblom* [1934], 216 Wis. 21, 255 N. W. 265, 256 N. W. 244." *Bailey v. Zwirowski, supra,* page 211.

If Robinson had looked to the left at the time that he approached the intersection and made the same observation as plaintiff did, it is quite obvious that he would have seen the Mueller vehicle, which was at that particular moment approaching at a very slow rate of speed, and he could have taken precautionary measures to avoid the collision.

The testimony further reflects that Robinson was familiar with the intersection and had driven over this highway several times.

In *Cherney v. Simonis, supra,* it is said (p. 344) :

"The presumption that others will not violate the law is a circumstance to be considered in determining negligence but is not necessarily controlling. The fact of negligence is to be determined from all the facts in evidence, in view of the presumption."

It, therefore, follows that the negligence of Robinson as to lookout was a substantial factor in producing the collision and that his failure to maintain a proper lookout constituted causal negligence as a matter of law, and the trial court's finding in this respect is sustained. *Oelke v. Earle* (1956), 271 Wis. 479, 483, 74 N. W. (2d) 336; *Pfeifer v. Standard Gateway Theater* (1952), 262 Wis. 229, 237, 55 N. W. (2d) 29.

The defendants Mueller and California Packing Corporation contend that the damages awarded are excessive.

(1) No question is raised as to the jury's award for hospital and medical expenses in the amount of $550.

(2) The award for past impairment of earning capacity and the award for physical disability and pain and suffering are challenged as grossly excessive—loss of earnings $3,950 —personal injuries $7,900.

The lower court in its decision stated that the trial court must be careful to fully consider the fact situation in the particular case before it when addressing itself to the ques-

tion of damages. The value of the dollar today is not what it was fifteen years ago, and our wages and costs of living have risen steadily. What would have been excessive years ago might not be even adequate today.

*Damages—Loss of Earnings—$3,950.*

The trial court held that the amount awarded by the jury had a true relation to the impairment of earning capacity suffered by the plaintiff from the date of accident until the date of trial. The trial court expressed the view that: "The question involved here is the extent to which plaintiff's earning capacity has been impaired or diminished rather than his actual wage loss or his actual loss of profit or income."

Crye testified that he worked as a carpenter, did concrete work and laying blocks, that he built houses, garages, and motels, that prior to the time of the accident his pay was $2.20 per hour. In 1954, he built a house for himself,— the value of which is $2,600. He further testified that he had money outstanding for work that he had personally done in 1954 and 1955 and that amount was between $1,500 and $1,700. That in the fall of 1953, he built a garage. During 1954 and 1955 summers he worked for Mr. Robinson in and around his motel. He stated that he always worked for himself. He further stated that in the year 1954, he earned between $2,200 and $2,500, but that it was not all in cash. Crye was asked:

"*Q.* What loss of wages do you think you suffered as a result of this accident? *A.* I would say between $1,700 and $2,000."

In *Dietz v. Goodman* (1950), 256 Wis. 370, 373, 41 N. W. (2d) 208, this court said:

"While evidence which tends to show a reduced capacity to earn caused by the plaintiff's physical disability resulting

from the injury is proper, still the diminution in his powers must be due to the negligent act. That diminution is to be ascertained as reasonably as humanly possible, and, when ascertained, that is the amount to be allowed and fixed accordingly.

"The quantum of damages to be allowed in a tort case is a matter within the province of the jury."

We have examined the testimony of the plaintiff with respect to the impairment of his earning capacity from the date of the accident, September 6, 1955, to the date of the verdict, May 27, 1958, and conclude from a review of that testimony that the figure of $3,950 is not unreasonable.

*Personal Injuries—$7,900.*

Leonard Crye suffered a chest injury with fractured ribs, a head and neck injury, and a rupture.

The trial court found that there was room in the entire testimony, including the expert medical opinions, for the jury to find and the court to conclude that the plaintiff had suffered permanent injury with substantial past and future pain and suffering, permanent impairment of earning capacity, and past and future diminution of capacity to enjoy life.

The trial court further stated in its decision that it was satisfied with the truthfulness of the plaintiff's own testimony as to his head injury and the extent of it.

Dr. Jack Saxe of Portage, Wisconsin, examined Crye on September 6, 1955, the date of the accident, at the Divine Saviour Hospital in Portage. In his testimony he stated that Crye was fairly well bruised up, complained of a great deal of pain in the head and chest, and down in both groin areas, the abdomen, and some pain in the legs. *Treatment administered:* Morphine for the pain, and treated with ice bags to the head and to the other bruised areas; and "I" believe the next morning "we" put a rib binder on him.

Dr. Saxe left for California for a trip of two or three weeks. During the interim Crye was under the care of Dr. Jones. On Dr. Saxe's return Crye still complained of headaches, stiffness in the neck, pain in both groin areas, and upon examination it was revealed he had a rupture on each side. He was operated on and the rupture repaired on March 27, 1956. He still complained about his headaches and then Dr. Saxe referred him to Dr. Suckle, a neurosurgeon.

Dr. Suckle testified that his examination of the plaintiff was based entirely upon subjective symptoms and statements of the plaintiff. In his testimony he concluded positively that the plaintiff would suffer headaches and neck pains for the rest of his life. Dr. Suckle examined Crye on September 20, 1956. Crye's chief complaint was that he had pain in the head and the neck. Crye also indicated that "he suffered a bruise in the left frontal region,—in other words, the left side of the head in the front; and on the left leg; and that he also had some fractured ribs." He had been treated by Dr. Saxe of Portage, and after treatment at the hospital for ten days he returned home and that he had worked intermittently since then. That he had headaches since the accident, and these were Crye's statements:

" 'I have them whenever I work. They are mostly in the back, but sometimes they go all over the head. I have them every day that I work. Aspirin and anacin help. I just had ordinary headaches before the accident, never like this. They are about the same, I don't think they are any better at all.

" 'My neck aches whenever I work. I never had that before the accident. It is only when I work that I have the headaches.

" 'My little fingers in my hands were numb at first, but this has cleared up. I don't have any numbness, no trouble with my hands now.'

"Mr. Crye stated that he had some rib injuries during World War II; that he had lost the hearing in the left ear years before. He said that he also had some dizziness as well as ringing in the ears with the headaches. And he had no other complaints.

"The examination showed that there was no abnormal findings of the cranial nerves,—in other words, the eyes, ears, nose, and throat were all normal, except for the hearing, that was absent in the left ear. There was pain along the neck in the back and along the long cervical muscles,— in other words, the muscles at the back of the neck, at the junction between the neck and the head.

"The patient was able to bend his neck forward and backward, but turning it from side to side was limited to about 50 per cent of normal, and was painful. In other words, if a person can turn their neck completely that way (indicating), which would be 90 degrees from the head-on position, he could turn it only about 50 per cent of normal.

"The X rays that were obtained showed that he had no skull fracture; that he had arthritis in the neck, but there was no fracture or dislocation. There was some disc narrowing between C5 and C6, which is the 5th and 6th cervical vertebrae. The electrical brain test was normal. And that is the pertinent findings in the examination of September 20, 1956."

"Q. Now, doctor, did you have occasion to see Mr. Crye again after that? A. Yes.

"Q. And could you tell us then what you found as to his condition? A. I saw Mr. Crye again on March 15, 1958.

"Q. And would you tell us what you found at that time, doctor, and what your opinion is? A. Well Mr. Crye stated

that after I saw him in September, 1956, that he felt better for several weeks; but when he attempted to return to work that he had an accentuation of the headaches as well as the pain in the back of the head."

"He stated that he had tightness of the fingers, and he also stated: " 'It aches at the top of my head most of the time, but it is worse when I work. There seems to be a rope . . . goes down the back of my neck to between my shoulders. It hurts worse when I try to bend over. I have only been able to work off and on. I haven't been able to get any help except with aspirin or anacin. The headaches are the same, the neck aches are the same, but they may be worse. My hands tingle all the time.'

"A review of the systems of the body did not contribute any further information. The examination showed essentially the same that we had seen before. There was restriction of the neck bending from side to side, and he had pain when he bent his neck; and there was tenderness of the neck and the spine in the neck region. But the remainder of the examination was exactly the same.

"We obtained additional X rays, to be certain that there was no change in the arthritis that we had seen in September, 1956, or the disc narrowing,—and that was the same, those two X-ray sets were the same.

"In conclusion, I stated in the first letter that inasmuch as Mr. Crye was unconscious that he had a cerebral concussion; that he also had an injury to the soft tissues of the scalp in the left frontal region,—in other words, here in the head (indicating), as well as the left leg and the fractured ribs.

"I also pointed out that there was no abnormality in the neurological examination and electroencephalogram; there was no evidence of a skull fracture, and that I believed

that the headaches were a reaction to the injury; and apparently the headaches that he had now were more severe than those that he had prior to the injury,—as he put it, 'the ordinary headaches before the injury;' the neck pain was due to a strain of the muscles of the neck or a cervical muscle strain; the arthritis that he had was not due to his injury, as this had obviously predated the accident, but that the arthritis had—at least *he could now experience a discomfort from the arthritis, and that this discomfort, with the headaches and the neck pains, would probably continue and be present the rest of his life.*" (Italics supplied.)

"*Q*. And doctor, would you say that then, *based upon your opinion* based upon reasonable medical certainty,—that his condition from the standpoint of his headaches and the strain of his neck and what you have mentioned here, was as a result of the accident that he was in? *A*. Yes, *based on the history that has been given to me, I think that they are due to his accident, . . .*" (Italics supplied.)

On cross-examination Dr. Suckle was asked:

"*Q*. And from your examination, as he turned his head from side to side was there any objective evidence that you could demonstrate yourself, through your own field, of any difficulty that he was having, other than what he told you? *A*. No. What I saw was that he had increase in pain when he turned his neck beyond about 50 per cent of normal from side to side; but it was his statement that he had the pain and this restriction of motion.

"*Q*. In other words, you observed—you asked him to turn his head, and then you watched as he turned it? *A*. Yes. . . .

"*Q*. In other words, by holding your hand here could you demonstrate any actual objective symptoms as he was turning it? *A*. No, just the amount of motion that he was able to do was all.

"*Q*. In other words, your tests were dependent entirely on what he said in his own words, is that correct? *A*. Yes."

Dr. George A. Berglund, a neurological surgeon, was called as a witness on behalf of the defendants, Mueller, California Packing Corporation, and California Packing Sales Company, Inc. On cross-examination Dr. Berglund was asked the following questions:

"*Q.* Now, doctor, can you state to a reasonable degree of medical certainty, based on your examination of Mr. Crye, whether or not you believe Mr. Crye has headaches and pains in his neck? *A.* I can't make a statement; I have no opinion.

"*Q.* Doctor, don't you ever base an opinion on subjective complaints? *A.* Supported by physical findings. Otherwise, I sometimes can't come to a definite diagnosis, unfortunately. . . .

"*Q.* Then, doctor, would it be correct to state that without objective symptoms you, as a specialist, cannot tell whether or not a person really has headaches and is complaining of them? *A.* You are using an incorrect statement there. There is no such thing as objective symptoms. Symptoms are feelings; and objective is what you see,—so there are two opposites there. So would you rephrase it, in the light of that? Do you understand what I mean?

"*Q.* Yes, I think so, doctor. . . . Without these objective findings you couldn't truthfully say whether or not a person had headaches then, could you? *A.* In some instances you can be pretty certain, because it follows a very typical pattern. Where they don't follow a pattern typical of anything, such as this, then I would have to say that I can only take what he tells me. And so I cannot say that he does not have, nor can I say that I can prove that he does have. I cannot prove he has, and I cannot say that he doesn't have."

In *Kearney v. Massman Construction Co.* (1945), 247 Wis. 56, 69, 18 N. W. (2d) 481, it was stated:

". . . severe headaches, nervousness, irritability, difficulty in sleeping, impairment of memory, and attacks of dizziness are in the field of subjective symptoms. Those are matters hard to disprove, the actual existence of which

rests almost entirely on the truthfulness of the patient. Plaintiff testified that when he gets a job he cannot keep it because of his condition; that he cannot stand noise; that he is afraid of crowds; that he has fallen at different times due to his nystagmus; that he runs into things; that his memory has been impaired; that at times he cannot get up, and at times cannot hold a cup of coffee in his hand.

"While the award of $15,000 for pain and suffering and future wage loss is high, *if the trial court believed the plaintiff's condition to be as he claimed it, and further believed that this condition was caused by the physical injuries sustained in the accident, we cannot say that the findings and award are against the great weight and clear preponderance of the evidence.*" (Italics supplied.)

The general rule on the matter of damages is found in 15 Am. Jur., Damages, pp. 621, 622, sec. 205:

"In actions sounding in damages merely, where the law furnishes no legal rule for measuring them, the amount to be awarded rests largely in the discretion of the jury, and with their verdict the courts are reluctant to interfere. As shown elsewhere, a verdict may be set aside as excessive by the trial court or on appeal when, and not unless, it is so clearly excessive as to indicate that it was the result of passion, prejudice, or corruption, or it is clear that the jury disregarded the evidence or the rules of law. . . .

"Since it is for the jury, and not for the court, to fix the amount of the damages, their verdict in an action for unliquidated damages will not be set aside merely because it is large or because the reviewing court would have awarded less. Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience."

In *Peterson v. Western Casualty & Surety Co.* (1958), 5 Wis. (2d) 535, 540, 93 N. W. (2d) 433, this court said:

"... the rule expressed in *Diemel v. Weirich* (1953), 264 Wis. 265, 268, 58 N. W. (2d) 651, with reference to allowance for the future continuation of pain where the injury is subjective in character, is applicable here, both to continuation of pain and other disagreeable sensations and continuation of the disability which results therefrom. 'The members of juries also being laymen should not be permitted to speculate how long, in their opinion, they think such pain will continue in the future, and fix damages therefor accordingly. *Only a medical expert is qualified to express an opinion to a medical certainty, or based on medical probabilities* (not mere possibilities), *as to whether the pain will continue in the future, and, if so, for how long a period it will so continue.'*" (Italics supplied.)

The testimony of Dr. Suckle comes within the rule expressed in *Diemel v. Weirich* (1953), 264 Wis. 265, 58 N. W. (2d) 651, with reference to allowance for the future continuation of pain where the injury is subjective in character, and that the head injury permanently impaired the plaintiff's capacity to earn a living, diminished his capacity to enjoy life, and resulted in substantial pain and suffering.

It is contended that the damages were excessive to such an extent that the award showed bias and prejudice on the part of the jury. This was considered by the trial court in its ruling on motions after verdict, when it made its determination that the damages were not excessive and that the award was not based on bias and prejudice.

The record discloses that the defendants vigorously contested the plaintiff's contention that his hernia was due to the accident, but it is evident from the jury's finding on medical and hospital expense that the cost of the hernia operation and treatment were included in the allowance. Although there was convincing medical testimony to the contrary, we are of the opinion that there is sufficient evidence in the record to support the jury finding.

We conclude that the amount of $7,900 awarded by the jury was not excessive, and is supported by the evidence.

### Remarks of Counsel.

Plaintiff's counsel made certain remarks in his closing argument to the jury "calculated to contrast the position of his 'poor' client and that of the 'corporation' defendants. Objection was taken and the court pointedly reprimanded plaintiff's counsel, and instructed the jury to disregard the remarks. Plaintiff's counsel offered the excuse that counsel for defendants Mueller and California Packing Corporation had vigorously attacked plaintiff's integrity as a witness in defense counsel's closing argument. While the court must recognize that there was provocative language in such closing argument, the court did not and does not consider this an adequate excuse for the retaliatory observations made to the jury by plaintiff's counsel and for which he was reprimanded by the court. . . . The court is confident that its reprimand of plaintiff's counsel, together with its instructions to the jury to disregard such remarks, removed any possible prejudicial effect they may have had."

We concur in the trial court's statement that its reprimand of plaintiff's counsel, together with its instructions to the jury, removed any possible prejudicial effect they may have had.

The fact, that the defendants Mueller and California Packing Corporation did not file a cross complaint for contribution, is immaterial in view of the fact that the defendants did fully litigate the issues in that respect, and the judgment properly provided for contribution. *Security Nat. Bank v. Plymouth Cheese Co.* (1958), 3 Wis. (2d) 40, 43, 87 N. W. (2d) 780; Restatement, Judgments, pp. 504, 505, sec. 106.

The judgment of the trial court is affirmed in all respects.

*By the Court.*—Judgment affirmed.