BETHKE, Respondent, vs. DUWE and another, Appellants.

*January 12—February 7, 1950.*

For the appellants there was a brief by *Byrne, Bubolz &* *Spanagel* of Appleton, and oral argument by *Edward J.* *Spanagel.*

For the respondent there was a brief by *Lehner & Lehner* of Princeton, and oral argument by *Philip Lehner*.

MARTIN, J. The only question on appeal is whether the award of damages is excessive.

The trial court stated in its opinion:

"At the outset the court feels impelled to state that the trial was conducted by counsel for all parties in an unusually fair and unprejudicial manner. The trial was singularly free from objections to admissibility of testimony or argument between counsel or any of the incidents so commonly found in the trial of personal-injury cases. The fact that the accident with resulting injuries to the plaintiff was caused by the negligence of the defendant Duwe in driving his automobile while intoxicated was kept away from the jury, and none of the jurors had, prior to the time they were impaneled, known of or heard of the accident in question. The court feels very definitely that no prejudicial matters crept into the trial which might have influenced the jury in determining the amount of the damages of the plaintiff.

"The court feels that the award of damages as returned by the jury in their verdict must be sustained. The court feels likewise that the amount found by the jury is probably in excess of what the court would have granted had the case been tried to the court without a jury but that is not the criterion to determine whether or not the verdict should stand."

The plaintiff, an unmarried schoolteacher in her early thirties, was injured on November 21, 1947. She was taken to the Mercy Hospital at Oshkosh, and the attending physician testified:

"At the time I saw her her injuries consisted of a laceration of the scalp and also several small lacerations over the left eyebrow and an abrasion of the forehead pretty close to the center about the size of a half a dollar. She was conscious but in addition to that her diagnosis was a brain concussion in addition to the lacerations. We had an X ray taken of her skull, which was negative for skull fracture. All of the lacerations were cleaned and sutured and she was admitted to the hospital and treated from there on systematically. She was in the hospital from 11-21 to 12-3, 1947. At the time of her

discharge the lacerations had healed without any evidence of infection."

After spending twelve days in the hospital, plaintiff was taken to her home in Ripon, spent two weeks in bed, then was in bed part of the time and went back to work as a schoolteacher on January 26, 1948. She followed the advice of her local physician and went to a skin specialist in Milwaukee for X-ray therapy for her forehead, which continued from January 19 to August 14, 1948. Unable to be relieved of the pain that she was suffering in her shoulder, neck, and eye, her medical advisers sent her to various specialists and she has been at Mayo's in Rochester, Minnesota, and the Wisconsin General Hospital at Madison, Wisconsin.

In October, 1948, plaintiff's counsel sent her to a doctor at Princeton, Wisconsin, who took several X rays and testified that he believed she had a fracture of the cervical vertebrae, fourth, fifth, and sixth, which he thought would account for the pain in her neck and upper back, but he was not sure of his interpretation so referred her to a doctor at Fond du Lac for verification.

The doctor at Fond du Lac testified as follows relating to the X-ray films made of the cervical vertebrae of plaintiff :

"*A*. The films in total show entirely negative with the exception of the lamina, that is the connection of the right side of the fifth cervical vertebra, of area of roughness which could be due either to an old fracture which had healed or otherwise. Otherwise the films are negative.

"*Q*. And would that injury account for the pain she is now complaining of in the neck? *A*. It could be one of the causes. I am not aware of what she is complaining of.

"*Q*. Well she is complaining of pain in the neck and spine which rotates into the left shoulder. Would that account for it? *A*. Not very well. This is on the right side."

Plaintiff testified : That the upper part of her vertebrae, her neck, and her left shoulder ache continuously causing her to be very much fatigued at the end of the day. For a long time

she has taken physiotherapy treatments. She was never bothered with headaches previous to the accident, but now has them at least four times a week. She has a dull ache in her left eye, and the eyelid feels stiff. As a result of the injury to her right knee, it is now in such condition that she falls quite frequently when walking upstairs. These tumbles are extremely humiliating to her as a schoolteacher as they occur in the presence of her pupils.

With regard to her facial disfigurement, plaintiff testified:

"*Q*. Now this big horseshoe scar which you have over your forehead how much of a cut did you have there, if you know? *A*. Well the cut was down to the skull and it was cut all the way around and the flesh was raised up into my hairline.

"*Q*. Were stitches required on your forehead? *A*. Yes many stitches were required. I asked Dr. Steen to count the number of stitches and he proceeded one morning and he counted up to twenty-five. Then he said there are more than twenty-five so he discontinued counting.

"*Q*. And did you have also a cut over the left eye? *A*. Yes I had four above the left eye and three over the right eye and there was one across the bridge of my nose and one right next to my left eye.

"*Q*. How close to your eyes did those lacerations go? *A*. Well I have them over both of my eyes. I have one over the right eye from which I took out a piece of glass three fourths of an inch long at Christmas time."

Plaintiff stated further that her forehead is now so sensitive to cold that she must board within two blocks of the school because she cannot tolerate the cold on her forehead; the severe stinging pain is almost unbearable. The sensibility in the region of the large horseshoe scar is partly gone, caused by a severance of the nerves, and it feels like a patch of clay on her forehead.

It is true that the complaints made by the plaintiff as to her injuries, the pain and discomfort which she has suffered and claims to still suffer from, are based largely on subjective symptoms, except for the disfigurement caused by the ugly

large scar on her forehead which will be permanent. In addition, she has keloids from the other scars.

In *Kearney v. Massman Construction Co.* (1945), 247 Wis. 56, 69, 18 N. W. (2d) 481, it was stated:

"All of the medical testimony is to the effect that plaintiff can, or should be able to, work. They find no objective symptoms that should interfere with performing ordinary labor. However, severe headaches, nervousness, irritability, difficulty in sleeping, impairment of memory, and attacks of dizziness are in the field of subjective symptoms. Those are matters hard to disprove, the actual existence of which rests almost entirely on the truthfulness of the patient. Plaintiff testified that when he gets a job he cannot keep it because of his condition; that he cannot stand noise; that he is afraid of crowds; that he has fallen at different times due to his nystagmus; that he runs into things; that his memory has been impaired; that at times he cannot get up, and at times cannot hold a cup of coffee in his hand."

A verdict of $15,000 based upon subjective symptoms was sustained.

The permanent disfigurement of plaintiff's face may well affect her future earnings, her ability to hold or procure a position as a schoolteacher, and her opportunities of marriage. There is no rule by which damages for the disfigurement of the faces of girls and young women may be measured, and assessment of damages in such cases will not be disturbed unless they exceed the bounds of reason and common sense. See *McCartie v. Muth* (1939), 230 Wis. 604, 607, 284 N. W. 529.

The general rule on the matter of damages is found in 15 Am. Jur., Damages, p. 621, sec. 205:

"In actions sounding in damages merely, where the law furnishes no legal rule for measuring them, the amount to be awarded rests largely in the discretion of the jury, and with their verdict the courts are reluctant to interfere. As shown elsewhere, a verdict may be set aside as excessive by the trial court or on appeal when, and not unless, it is so

clearly excessive as to indicate that it was the result of passion, prejudice, or corruption, or it is clear that the jury disregarded the evidence or the rules of law. . . .

"Since it is for the jury, and not for the court, to fix the amount of the damages, their verdict in an action for unliquidated damages will not be set aside merely because it is large or because the reviewing court would have awarded less. Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience. . . ."

Defendants have cited a number of cases to sustain their position that the damages are excessive. However, every case must be determined on its own facts. In addition to what we have already set forth, the jury could properly consider the professional training of the plaintiff in determining the allowance to be made for damages because of disfigurement; and the allowance to be made for pain and suffering for a year preceding the trial and the physical disability and impairment of ability to enjoy life resulting from the injuries sustained, which the evidence discloses were established to a reasonable certainty, are capable of a wide variation in amount.

The jury had a right to award damages based on economic conditions as to value of the dollar. See *Zeinemann v. Gasser* (1947), 251 Wis. 238, 247, 29 N. W. (2d) 49, and *Parr v. Douglas* (1948), 253 Wis. 311, 324, 34 N. W. (2d) 229.

We have carefully reviewed the evidence and hold that the jury's verdict, which was approved by the trial court, was not perverse. No element of bias, passion, or prejudice affected the decision.

*By the Court.*—Judgment affirmed.

FRITZ, C. J., and HUGHES, J., dissent.