CORDS, and others, Respondents, v. ANDERSON, Appellant. [Case No. 75–140.]†

CORDS, and others, Plaintiffs-Respondents: HENRY and another, Plaintiffs-Appellants, v. ANDERSON, Defendant-Respondent. [Case No. 75–141.]†

*Nos. 75–140, 75–141. Argued March 28, 1977.—*
*Decided November 14, 1977.*
(Also reported in 259 N. W. 2d 672.)

bank, it gives an issuer who wrongfully honors a demand a remedy against the beneficiary.

† Motion for rehearing pending. This motion was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

526

528

For the defendant-appellant there was a brief and a combined reply brief of defendant-appellant and defendant-respondent on cross appeal by *Bronson C. La Follette,* attorney general, and *Theodore L. Priebe,* assistant attorney general, and oral argument by *Mr. Priebe.*

There were combined briefs of plaintiffs-respondents and plaintiffs-appellants by *Wickhem, Consigny, Andrews, Hemming & Barton, S. C.* and oral argument by *John C. Wickhem,* all of Janesville.

DAY, J.   This matter is before the court on appeals and a cross-appeal from three judgments entered on February 25, 1975. In case #75–140, the defendant-appellant, Floyd K. Anderson, appeals from two judgments entered against him and in favor of plaintiffs-respondents, Jane Cords and Erwin T. Cords, her father and Norina Boyle and John J. Boyle, her father. In case #75–141, plaintiffs-respondents, Jane Cords and Erwin T. Cords, cross-appeal from the judgment in their favor, while plaintiffs-appellants, Susan Henry and Roland Henry, her father, appeal from the judgment dismissing their causes of action against the defendant-respondent, Floyd K. Anderson. The cases were consolidated for purposes of briefing and argument.

These cases present several questions.

I.   Did the defendant, Floyd K. Anderson, as manager of the state-owned Department of Natural Resources (DNR) operated "scientific area" known as Parfrey's Glen, have a "ministrial duty" to either notify his superiors of dangerous natural features of the land within inches of the path or trial where people were invited to walk or to erect signs warning the public of such dangers within the glen, especially after twilight?

The trial court said there was such a duty. We agree and so hold.

II.   Should the rescue doctrine be applied to the actions of Jane Cords and Susan Henry to lessen their

duty of due care for their own safety when, within ten to fifteen minutes after Norina Boyle's fall into the forge, together they attempted to climb down the pathway leading from the top of the cliff to come to her aid.

We hold that the rescue doctrine does apply and reverse the trial court on this issue, and remand for further proceedings.

III. Where the evidence of Jane Cords' future medical expense established her current annual expense of $3,270 and the only economic evidence was that the medical care component of the Consumer Price Index has risen from 1967 through 1973 at 5% per year for a total rise during said years was 37.7%; did the trial court err by refusing to consider that evidence in determining damages?

We hold that the trial court did err and that the reasonable probability of an increase or decrease in medical costs is a proper consideration for the court in the exercise of its discretion in assessing future medical expense and we remand for further proceedings.

IV. Was the trial court's award of general damages in the amount of $300,000 for the injuries sustained by Jane Cords inadequate and without a reasonable basis in the evidence?

We hold that the trial court's damage award of $300,-000 was supported by a reasonable basis in the evidence.

## FACTS

Parfrey's Glen, an area approximately eighty-nine acres in size is owned by the State of Wisconsin and located about four miles from Devil's Lake State Park in Sauk county. In it is a preglacial gorge and it contains unique geological features of particular interest to scientists and students. A small stream once utilized to operate a gristmill has cut a canyon ranging from a

few feet to nearly a hundred feet deep for a distance of approximately a thousand feet. The state acquired the property in 1947 and it is frequently visited by groups and by individuals. In 1953 and 1963, the state acquired an additional 80 and 151 acre parcels used as buffer zones to protect the unique and delicate plant life found in this area. It is called a "scientific area" because of its terrain and plant life.

On May 2, 1970, the three plaintiffs, Norina Boyle, Jane Cords and Sue Henry were students at the University of Wisconsin-Madison and each visited Parfrey's Glen for the first time. They were part of a group of four couples who had travelled by car from Madison for the purpose of picnicking and hiking in the Glen. The fourth girl, Vicky Helendar and the four young men, Dean Schraufnagel, Tom Tibbits, Jerry Rousseau and Tom Nelson had each been to the Glen at least once before.

Parfrey's Glen fronts on a public highway where a sign announces to the public traveling in each direction; "Entrance to Parfrey's Glen—Wisconsin Conservation Department." The entrance road leads northerly over a quarter of a mile to a hard surfaced parking lot. Near the far end of the parking lot is a large sign that states,

*"Parfrey's Glen State Scientific Area.* This area has been established by the State of Wisconsin to protect and preserve natural conditions for scientific study and research. The public is welcome to enjoy this area. Disturbing in any way animals or any living or dead vegetation is unlawful. Wisconsin Conservation Commission."

A small sign along the entrance drive announced the closing hours of the "Park" from 11:00 p.m. to 4:00 a.m. and prohibiting use of alcoholic beverages during the period of April 1st to May 18th.

North of the parking area, a gravel pathway runs past toilet facilities and numerous picnic tables, barbe-

que and garbage facilities. The gravel pathway forks a short distance north of the public toilets, one trail leads into the gorge at stream level known as the "lower trail" and the other trail travels upwards along the east side of the gorge leading to high ground over the stream "upper trail." A department "trail" sign consisting of yellow letters on a brown wooden background points to the lower trail. These two trails join some distance to the north near the end of the canyon beyond a waterfall and thereby create a circular trail system. At the north end, the lower trail turns easterly and ascends into the bluff area known as the "ascending-descending trail." Logs pegged into position along the trail facilitate climbing. At the top of the ascending trail is a camp site or picnic area where larger logs adjoin an area near charred remnants of fires. This area is used for picnics and no signs prohibit fires there. From the picnic site the upper trail leads southerly meandering around the high ground with numerous trail offshoots leading easterly to woods. At places, the upper trail comes within inches of the bluff edge or a bluff undercut. The high ground has obvious dropoffs to the west and to the northwest of the picnic area. A main branch of the upper trail running south from the picnic area toward the parking lot comes within a foot of the high bluff where the bluff is undercut obliquely to the southeast. The undercut is narrow, not readily discernible and within forty-five feet of the picnic area. This cutback or "shoot" as it was referred to in the testimony is at a place where one misstep of a foot in a southerly direction would cause an uninterrupted twenty foot slide down a sharp incline to a direct dropoff of approximately eighty feet to the rock bottom of the gorge. This is the point where Norina Boyle fell.

The four young couples arrived at Parfrey's Glen at approximately noon on May 2, 1970. They brought food and sandwiches purchased earlier in the day and also cases

of beer and a bottle of wine. They had some conversation about the sign forbidding the use of beer during April and May and concluded that it was an effort to control high-school groups at prom time. Dean Schraufnagel led the group on the lower trail toward the north and he explained some of the rocks and plant life present to the others in the group. At the site of the waterfall, they went up the ascending-descending trail to the picnic area where they deposited their food. Tom Nelson took part of the beer, and wrapped it in his jacket and put it in a separate place to keep cool. Norina Boyle was accompanied by Dean Schraufnagel and they walked to other parts of the Glen west and north of the waterfall. The other couples went on similar walks. They all returned about midafternoon to the campsite, ate the food they had brought and drank some of the beer.

While they were having lunch, Park Ranger Schutte, who was making his first patrol ever through Parfrey's Glen, came across the group. He told them beer was prohibited and directed them to empty their beer supply which they did. Later they got the beer that Mr. Nelson had wrapped in his jacket and drank it with their evening meal. When they asked Mr. Schutte if the could continue their lunch and stay, he told them that they could.

He subsequently filed an official report with Mr. Anderson, the Park Manager, in which he stated, "All the individuals were neatly dressed and neat appearing. The men were clean shaven, and their hair was combed. None of the group appeared to be drunk . . . their attitude was good, they did not give me any static, no back talk, so I decided to merely have them dump the beer."

Ms. Boyle testified she had two to four cans of beer the whole day and the testimony of others was that she appeared sober at all times. She testified that none of the beer she drank had any effect upon her. There is no contradicting testimony. Jane Cords had about three

cans of beer the entire day and testified that she was unaffected and that testimony was substantiated by the others. Sue Henry was described by some of the party as "giddy" or "silly." Others in the group described her as sober. The trial court found that Ms. Henry "was a little intoxicated or silly, or at least showing the signs of ingestion of alcoholic beverages."

Following lunch, the couples hiked around the area meeting at the picnic site for their evening meal. When it grew cooler they built a campfire on the location of ashes from previous fires. Norina had walked around the area but had not gone to see the upper trail area where she later fell. Mr. Tibbits stood about fifteen feet south of the campfire when Ms. Boyle, walking southerly, passed him on the trail. No one is sure why she did this. Her own traumatic amnesia prevents her from recalling the incident. Most of the group thought she was going to relieve herself away from the campfire area. There was some testimony that she may have been looking for a glove or gloves. She continued on the upper trail until she disappeared from the light of the campfire. In a few moments, a noise was heard that sounded like a falling object. Several in the group called out Ms. Boyle's name and when there was no response, they were alarmed. Mr. Tibbits took the only flashlight in the group and went down the ascending-descending trail to the gorge below. Shortly he called up that he found her at the bottom of the gorge, that she didn't have a pulse and that she needed mouth-to-mouth resuscitation. Mr. Rousseau went down into the gorge by the same route without a flashlight. He returned to the bluff campsite and told Sue Henry and Jane Cords to stay by the fire and wait for awhile. He also told them that Sue Henry might be able to help Ms. Boyle because she had previous nursing experience.

Ms. Cords was very upset after Ms. Boyle's fall because Ms. Boyle was her best friend. Ms. Cords had found out during the day that Ms. Henry was a trained practical nurse. Ms. Cords had gone to get wood for the fire and when she returned, Ms. Henry said she was going to go down into the gorge and give Mr. Tibbits some assistance, because she was a nurse's aide.

Ms. Henry and Ms. Cords went down the trail that Ms. Cords had been on two or three times that day. They took a few steps and decided to sit down and slide down because it would be safer to feel their way. As they were going down, she saw Sue Henry go down and reached out for her. Ms. Cords testified that she thought Ms. Henry was falling and reached for her and "I tumbled over forward, I can remember falling." She regained consciousness at the bottom of the gorge. She tried to get up and couldn't. At the time of their fall, they were following the path, the ascending-descending trail, that Mr. Rousseau and Mr. Tibbits had gone on to try and find Ms. Boyle. Ms. Henry and Ms. Cords fell about sixty feet.

Ms. Boyle's fall had occurred about 8:30 p.m. and it was ten to fifteen minutes later that the other two young ladies had their accident. The women were later taken out of the gorge by the authorities to the hospital.

Ms. Cords received very serious injuries and will be confined to a wheel chair for the rest of her life. Her injuries are discussed in greater detail infra.

Sue Henry was nineteen years old at the time of accident. She graduated from the University of Wisconsin in Madison in August of 1972 with a B.A. in social work. She was a nurse's aide for sixteen to thirty-two hours a week at University Hospitals from January 1969 through April 1970. She was also a nursing student and had about eleven weeks of the first nursing course. She considered herself experienced in matters such as first

aid and was majoring in nursing until one or two weeks prior to the accident. She received a skull fracture in the accident and says that as a result of the day's activities, her memory is very poor. She remembers no discussion about even going to Parfrey's Glen. She doesn't remember drinking any beer and doesn't remember falling.

## Floyd K. Anderson's Testimony

Floyd K. Anderson was the manager of Devil's Lake State Park and also Parfrey's Glen at the time that these accidents occurred. He started out with the department as a carpenter and in August of 1958, he was transferred to Copper Falls State Park in Ashland County as Park Manager. He had no training as a park manager before assuming those duties except what he described as "informal training for just one day." He said his duties there were to make sure that the equipment, including trucks, tractors, mowers, bridges and guard rails around the gorge in that park were safe. He stated that he had to be sure that the "guard rails and trails were in safe condition." He estimated that while he was there, a half mile of guard rail and two and one-half to three miles of foot paths were constructed under his supervision. He stated that the duty of the park manager was to render reports to his superiors as to what steps were to be taken to reduce safety hazards or improve conditions for public use. While at Copper Falls he made such reports to his area supervisor. He was also free to initiate safety precautions on his own at Copper Falls. He closed off unsafe steps and closed an observation tower for repairs because of unsafe timbers in the platform of the observation tower.

Mr. Anderson came to Devil's Lake and Parfrey's Glen in 1965 as an assistant park manager. By 1966 he knew that the paths at Parfrey's Glen went near the edge

of sheer drop off right into the glen and that the trails never had any rail, sign or protective devices of any kind warning people or advising them not to use the upper trail. Mr. Anderson knew that these trails were especially hazardous at night, but from 1965 to the time of the accident, there were no signs warning of the hazard. He agreed that these conditions were hazardous and that he wouldn't want to be on the trails after dark.

In November 1968 Anderson became park manager of Devil's Lake and Parfrey's Glen. During that time he could not have closed any of the trails at the glen without his supervisor's consent, but he never even informed his supervisor of any of the hazardous conditions. It was his job to make recommendations for public safety at the glen. He never recommended to his supervisors that warning signs be erected or that trails be closed. He didn't know if his supervisor had ever been at the glen.

Trial was before the court and on February 25, 1975, the trial court entered the following judgments:

(1) For Erwin T. Cords against the defendant in the amount of $7,675.54.

(2) For Jane Cords against the defendant in the amount of $208,921.06.

(3) For John J. Boyle against the defendant in the amount of $4,772.98.

(4) For Norina Boyle against the defendant in the amount of $36,128.04.

(5) Dismissal of the actions of Roland Henry and Susan Henry against the defendant.

Defendant Anderson, represented by the Attorney General, appealed from the judgment in favor of the plaintiffs Irwin and Jane Cords, and John and Norina Boyle. Plaintiffs Irwin and Jane Cords, cross-appealed from the same judgment as to the trial court's findings on negligence and damages. Plaintiffs Roland and Susan

Henry, appealed from the judgment dismissing their causes of action against the defendant.

## I.  PARK MANAGER'S DUTY.

The first question is whether Mr. Anderson, as manager of the state-owned, Department of Natural Resources (DNR) operated Parfrey's Glen, had a "ministerial duty" to either notify his superiors of hazardous natural features inches from the trail or to erect signs warning the public of such dangers, particularly after dark.

The Attorney General misinterprets this first question.[1] It is not whether Anderson was required to tell his supervisors that a ninety foot cliff was dangerous after dark. The question is whether the supervisors should have been notified about a trail that people regularly used and that passed a few inches from an undercut dropping into a ninety foot gorge.

The second question posed by the Attorney General is, "Does a manager . . . have a ministerial duty to erect a sign warning of an obvious danger such as falling from a ninety foot cliff, where his superiors have authorized no such sign and the written policy is to 'leave it alone.' " There can be no policy of leaving it alone when such an obvious danger exists. This phrasing is an attempt to reduce the duty question to an absurdity and it offers no help in analyzing the legal issues involved in view of the fact situation which this case presents.

---

[1] He states the first question to be: "Does the failure of a manager of a state-owned scientific area to notify his superiors, who are already familiar with the area terrain, that he considers a ninety foot cliff dangerous after dark, constitute negligence where managers and superiors are following administrative rules and scientific areas preservation policy to 'leave it alone.?' "

The proper question involves an analysis of the legal theory under which a plaintiff in a negligence suit can recover from a public officer individually acting in his capacity as a public officer and employee of the state.

Parfrey's Glen was a state-owned recreational area maintained, supervised and operated by the DNR. The public was invited and encouraged to enter upon the land for recreational, educational and other purposes. This cause of action arose prior to this court's decision in *Antoniewicz v. Reszczynski*, 70 Wis.2d 836, 231 N.W. 2d (1975) wherein this court abolished the distinction between invitees and licensees with regard to a landowner's duty. The role of the state as landlord is not involved in this case because the state is immune from suit under the constitution of the state.[2] *Cords v. Ehly*, 62 Wis.2d 31, 35, 36, 214 N.W.2d 432 (1974).

There is general personal tort immunity for a public official acting within the scope of his official authority and in the line of his official duties. In *Lister v. Board*

---

[2] Art. IV, sec. 27, of the Wisconsin Constitution provides:

"The legislature shall direct by law in what manner and in what court suits may be brought against the state."

The rule developed from this constitutional provision is that the state cannot be sued without its consent. *Kenosha v. State*, 35 Wis.2d 317, 322, 151 N.W.2d 36 (1967). However sec. 270.58, Stats. (1969) provides:

"*State and Political Subdivisions Thereof To Pay Judgments Taken Against Officers*. (1) Where the defendant in any action or special proceeding is a public officer or employe and is proceeded against in his official capacity or is proceeded against as an individual because of acts committed while carrying out his duties as an officer or employe and the jury or the court finds that he acted in good faith the judgment as to damages and costs entered against the officer or employe shall be paid by the state or political subdivision of which he is an officer or employe . . ."

The trial court found that Mr. Anderson acted in good faith.

*of Regents,* 72 Wis.2d 282, 240 N.W.2d 610 (1976), this court stated at p. 300:

"The general rule is that a public officer is not personally liable to one injured as a result of an act performed within the scope of his official authority and in the line of his official duty. The various exceptions to this rule are determined by a judicial balancing of the need of public officers to perform their functions freely against the right of an aggrieved party to seek redress."

This court further noted that a public officer's personal tort immunity was not based upon the doctrine of sovereign immunity, but rather upon different considerations:

"The doctrine of sovereign immunity and the principle which extends an immunity to public officers from civil liability for damages are two separate and distinct concepts. As noted above, the state sovereign immunity from suit is procedural in nature and arises from the state constitution. The immunity afforded public officers with respect to the performance of their official functions, on the other hand, is a substantive limitation on their personal liability for damages and is common law. It does not derive, as the language in some cases would imply, from the state's sovereign immunity under art. IV, sec. 27 of the Wisconsin Constitution, but from considerations of public policy. These considerations have been variously identified in the cases as follows: (1) The danger of influencing public officers in the performance of their functions by the threat of lawsuit; (2) the deterrent effect which the threat of personal liability might have on those who are considering entering public service; (3) the drain on valuable time caused by such actions; (4) the unfairness of subjecting officials to personal liability for the acts of their subordinates; and (5) the feeling that the ballot and removal procedures are more appropriate methods of dealing with misconduct in public office." *Lister, supra,* 298, 299.

*See also: Cords v. Ehly, supra,* 39; *Bromund v. Holt,* 24 Wis.2d 336, 129 N.W.2d 149 (1964).

There is an exception to the general rule that a public official acting within the scope of his official authority and in the line of his official duties is immune from tort liability. That exception was expressed by this court in *Lister, supra,* pp. 300, 301:

"The most generally recognized exception to the rule of immunity is that an officer is liable for damages resulting from his negligent performance of a purely ministerial duty. A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion."

*See also: Cords v. Ehly, supra,* 41; *Chart, supra,* 101; *Clausen v. Eckstein,* 7 Wis.2d 409, 413, 97 N.W.2d 201 (1959); *Meyer v. Carman,* 271 Wis. 329, 331, 332, 73 N.W.2d 514 (1955).

The question here is whether the defendant Anderson had an absolute, certain, or imperative duty to either place the signs warning the public of the dangerous conditions existing on the upper trail or to advise his superiors of the condition with a view toward adequate protection of the public responding to the invitation to use this facility. There comes a time when "the buck stops." Anderson knew the terrain at the glen was dangerous particularly at night; he was in a position as park manager to do something about it; he failed to do anything about it. He is liable for the breach of this duty.

Mr. Anderson's supervisors testified that he could have put up warnings signs in the same manner that

he put up other signs at Devil's Lake. Mr. Anderson could also have asked to close the upper trails. Both of these precautions would have required a supervisor's approval, but the approval was never sought nor were the supervisors ever apprised of the danger.

We hold that the duty to either place warning signs or advise superiors of the conditions is, on the facts here, a duty so clear and so absolute that it falls within the definition of a ministerial duty.

The plaintiff Norina Boyle does not challenge the allocation of negligence made by the trial court which found 55% causal negligence attributable to the defendant Anderson and 45% to her. The state claims that Ms. Boyle's negligence was greater than any negligence of Mr. Anderson.

An examination of the entire record shows that the allocation of negligence and the finding of causality by the trial court is not against the great weight and clear preponderance of the evidence and accordingly we must affirm the trial court's finding in this respect. The amount of damages awarded to Norina Boyle and her father are undisputed and are therefore affirmed.

## II. *APPLICABILITY OF RESCUE DOCTRINE.*

In 1921, Justice Cardozo, in *Wagner v. International Ry.*, 232 N.Y. 176, 133 N.E. 437, 438 (1921), set forth the principles underlying the doctrine that absolves a rescuer from finding of contributory negligence.

"Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. The wrong that imperils life is a wrong to the imperiled

victim; it is wrong also to his rescuer. The state that leaves an opening in a bridge is liable to the child that falls into the stream, but liable also to the parent who plunges to its aid. . . . The risk of rescue, if only it be not wanton, is borne of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of the deliverer. He is accountable as if he had . . ."

In 65A C.J.S., Negligence, Sec. 124, the rule is stated:

"Under what is commonly referred to as the rescue doctrine, conduct which might otherwise be considered contributory negligence may not be so considered where a person is injured in attempting to save others from imminent danger or personal injury or death. Persons are held justified in assuming greater risks in the protection of human life where they would not be under other circumstances."

"One is not guilty of contributory negligence in exposing himself to danger of injury in order to rescue another from imminent danger of personal injury or death, if, under the same or similar circumstances, an ordinary prudent person might so expose himself, or, as often expressed, if the act of intervention is not performed under such circumstances as would make it rash or reckless in the judgment of ordinarily prudent persons. This is true even though the person attempting the rescue knows it involves great hazard to himself without certainty of accomplishing the attempted rescue and even though in attempting such rescue he thereby imperils his own life."

*Wagner* and the rescue doctrine were cited with approval in *Central Wis. Trust Co. v. Chicago & N.W. R. Co.*, 232 Wis. 536, 543, 287 N.W. 699 (1939), The doctrine was again cited in *Brady v. Chicago & N.W. R. Co.*, 265 Wis. 618, 625, 62 N.W.2d 415 (1954). In *Brady,* this court said:

"Liability by a defendant to a rescuer must rest on a breach of a duty owed directly by the defendant to

the rescuer, or by the defendant to the person whose rescue is attempted . . ."

Susan Henry suffered from traumatic amnesia and was unable to recall events prior to, during or following her fall into the glen.

Jane Cords, however, recalled the events following Norina Boyle's fall:

". . . Sue Henry and myself were at the fire . . . we decided to keep the fire, keep it going . . . I knew she (Susan Henry) was a nurse's aide at the hospital . . . When I came back from getting some wood for the fire, Sue, I believe, had some blankets and said she was going to go down and give Tom Tibbits some assistance, that she was an aide and she may have pointed it out to me again, and it sounded like a real good idea . . . Since it was so dark, I was a little, . . . my first reaction was, oh, no, we'll never make it. But when Norina really needed help and I knew . . . the blankets would help her and if Sue could give her any aid at all, it would be really good. And so Norina's need far outweighed any hazard to myself and Sue and we buttoned up our coats and I put my gloves on and we were going to take it slow and easy and, . . . work our way down . . . We were going to stay very close together. We were (holding on to each other) . . . Sue . . . went down first and (Jane Cords was behind holding her) . . . We were going to go down the exact way we had come up that day. So I had been down and up there, up that trail two or three times, so that's the trail we were going to take down. We started down and we got—we took a few steps and we decided to sit down and slide down because that would be safer to kind of feel our way. We didn't get too far before we fell . . . I don't know if I saw Sue go down and I reached out for her or—that's sort of the way I remember. I can remember seeing Sue go down but I don't know if she just jumped on to a lower level. I believe that I thought she was falling and I reached for her, and then I tumbled over forward and I can remember falling, . . ."

On cross-examination, Jane Cords testified regarding Sue Henry:

"I figured she would find her way down there but I would help her, steady her. I guess two heads are better than one . . . At that point, I was thinking of Norina lying down in the ravine, . . . I was just really concerned about Norina . . ."

The trial court on this record held that the "rescue doctrine" did not apply and assessed forty percent negligence to Ms. Cords and sixty percent negligence to Ms. Henry. In giving reasons for holding both women causally negligent, the trial court said:

"Plaintiffs Henry and Cords urge the Court to apply the 'Rescue Rule' in arriving at causation, and a combination of rescue argument and emergency argument to urge absence of negligence on the part of these two girls . . . Suffice it to say that the facts here would not fit the rule for several reasons. Tibbits had already found Boyle and was assisting her, so in a sense she had already been rescued. Secondly, some 10 to 15 minutes elapsed between Boyle's fall and the start down the trail by Cords and Henry so that the situation probably no longer compelled rescue. No one was calling for their assistance and help had already been gone for . . . These plaintiffs urge that the compelling urgency of the situation requires invoking the emergency doctrine or the rescue rule thereby excusing them from taking precautionary steps that otherwise might be taken upon reflection. The rescue rule is in a sense an emergency doctrine. However, since the Court feels that both of them were negligent, no application of any emergency or rescue rule should be invoked . . ."

We hold that the Court erred in its ruling that the rescue doctrine did not apply here. The court confused the emergency doctrine with the rescue rule, but the two are separate. The "emergency doctrine" relieves a person of liability for his actions when that person is faced with a sudden emergency that he didn't help to create.

This Court in *Lutz v. Shelby Mut. Ins. Co.*, 70 Wis.2d 743, 754, 235 N.W.2d 426 (1975) held that there are three basic requirements which must be met before the emergency doctrine can be applied. First, the party seeking the benefits of the emergency doctrine must be free from negligence which contributed to the creation of the emergency. Second, *the time element in which action is required must be short enough to preclude deliberate and intelligent choice of action.* Third, the element of negligence being inquired into must concern management and control before the emergency doctrine can apply.

The emergency doctrine is most commonly applied in auto accident situations and is a different doctrine applied to a different set of facts than is the rescue rule. The requirement in the emergency doctrine that the time element must be so short as to preclude a deliberate or intelligent choice of action is not an element in the rescue doctrine. The rescue doctrine is applicable even though the action of the one doing the rescue is deliberate and taken after some planning or consideration.

"We may assume, though we are not required to decide, that peril and rescue must be in substance one transaction, that the sight of the one must have aroused the impulse of the other; in short, that there must be unbroken continuity between the commission of the wrong and the effort to avert its consequences. . . . The law does not discriminate between the rescuer oblivious of peril and the one who counts the cost. It is enough that the act, whether impulsive or deliberate, is the child of the occasion." *Wagner, supra,* at 438.

Even though rescuers are given special consideration under the law, they are not protected in all circumstances.

"A rescuer—one who, from the most unselfish motives, prompted by the noblest impulses than can impel man to deeds of heroism, faces deadly peril—ought not to hear from the law words of condemnation of his bravery, because he rushed into danger, to snatch from it the life of a fellow creature imperiled by the negligence of another; but he should rather listen to words of approval, unless regretfully withheld on account of the unmistakable evidence of his rashness and imprudence." *Corbin v. City of Philadelphia*, 195 Pa. 461, 45 A. 1070, 1072, 1073 (1900).

Even as rescuers, Ms. Cords and Ms. Henry will not be absolved of all negligence if their action was unreasonable under the circumstances.

The two women had been told by Mr. Tibbits to stay at the fire. After Ms. Boyle fell they knew that walking the trail might be dangerous, but Ms. Cords had walked the trail two or three times that day without mishap and Mr. Rousseau had negotiated it minutes earlier without a flashlight. Ms. Henry, who had training as a nurse was also told that she might be able to assist the injured Ms. Boyle who had no pulse and who required artificial resuscitation. Ms. Henry and Ms. Cords started down the trail with blankets that would have been helpful if Ms. Boyle was in shock.[3] The trial court found that Ms. Cords was not under the influence of intoxicants, but that Ms. Henry was "a little intoxicated or silly."

The trial court took many of these same factors into account, but decided that the rescue rule didn't apply because Ms. Cords and Ms. Henry were negligent. The trial court's analysis fails to consider the purpose of the rescue rule which is to encourage rescues even where danger is involved. The question is whether the social interest in attempting to effect a rescue is such that the

---

[3] Proper treatment for shock includes maintenance of body temperature. *Attorney's Textbook Of Medicine*, 3rd Ed., Roscoe N. Gray, M.D., vol. 1A, paragraph 10.16(3).

conduct of a plaintiff in attempting the rescue is unreasonable under the circumstances?[4]

The rule is stated in *The Law of Torts*, W. L. Prosser, 4th Edition, West Publishing Co., 1971, p. 451:

"In all these cases, of course, the danger may be so extreme as to be out of all proportion to the value of the interest to be protected, and the plaintiff may be charged with contributory negligence in his own unreasonable conduct."

We hold that a rescuer is not negligent where the rescue, although dangerous, is not unreasonable or unreasonably carried out. In a comparative negligence jurisdiction such as Wisconsin, if the trier of fact finds that the rescue is unreasonable or unreasonably carried out the fact finder should then make a comparison of negligence between the rescuer and the one whose negligence created the situation to which the rescue was a response.

In the case before us, if the trier of fact, after applying the rescue doctrine, found Ms. Cords acted unreasonably, then it would make a comparison of her negligence with Anderson's. The same would be true if Ms. Henry was found to have acted unreasonably. Her negligence would then be compared to Anderson's negligence, Anderson having been found negligent in this case and that finding confirmed by a majority of this court. Given Ms. Boyle's condition after a fall of eighty or more feet, Ms. Henry's nursing experience, Ms. Cords familiarity with the trail and the cautious manner in which they started down the trail, the trial court must determine from the record whether the de-

---

[4] In jurisdictions where the doctrine of contributory negligence governs, the rescuer's conduct must be "rash and imprudent," *Corbin, supra*, or "wanton," *Wagner, supra*, to be beyond the protection of the rescue doctrine.

cision to go to Ms. Boyle's aid was reasonable and reasonably carried out. Both these women were entitled to have the trier of fact consider their actions under the rescue doctrine.

We reverse the judgment dismissing the action of Susan Henry and her father and remand the case to the trial court for determination under the rescue rule. The damages to Susan Henry and her father found by the trial court are not challenged on this appeal[5] and therefore stand in the calculation of any award the trial court may make.

Having found the damages as determined by the trial court in the case of Jane and Erwin Cords to be reasonable, except as to future medical expenses, those figures will stand in the calculation of any award the trial court may make on remand.[6]

## III. *FUTURE MEDICAL EXPENSES.*

The plaintiff's economic expert determined that if medical costs remained constant indefinitely into the future, Ms. Cords future medical expenses would be $45,284, reduced to present value. But if the present five per cent rate of medical cost inflation continues

---

[5] The trial court found medical, hospital and related expenses incurred by Roland Henry in the amount of $2,314.15. $18.25 of the same expenses were found for Susan Henry. $25,000 was found by the trial court as a reasonable sum to compensate Susan Henry for her injuries.

[6] The trial court found the following:

$2,917.77 in medical, hospital and related expense damage incurred by her to the date of the findings. The figure was stipulated by the parties.

$300,000 as a fair and reasonable sum to compensate her for her injuries. The defendant does not challenge that figure.

$45,284.00 for future medical expense reduced to present value. This finding is discussed below. The defendant does not challenge this figure.

into the future, Ms. Cords medical expenses would be $104,988 reduced to present value. The trial judge allowed Ms. Cords $45,284 for future medical expenses and refused to make any allowance for rising medical costs. Jane Cords argues that the trial court erred in refusing to consider the effect of inflation on her future medical expenses. We agree.

This court has previously taken into account the effect of inflation on the adequacy of damage verdicts. A verdict that ". . . would have been excessive years ago might not even be adequate today." *Crye v. Mueller,* 7 Wis.2d 182, 191, 96 N.W.2d 520 (1958). Juries have been allowed to consider changing economic conditions between the time of injury and the time of trial and jury instructions to that effect have been approved. *Bethke v. Duwe,* 256 Wis. 378, 41 N.W.2d 277 (1949); *Dabareiner v. Weisflog,* 253 Wis. 23, 33 N.W.2d 220 (1948).

Whether future inflation should be considered in determining future damages has not previously been decided by this court. In some of the federal courts of appeal the recent trend has been to allow, but not require the fact finder to consider inflation when awarding future damages. *Perry v. Allegheny Airlines, Inc.,* 489 F.2d 1349 (2nd Cir. 1974); *Willmore v. Hertz Corp.,* 437 F.2d 357 (6th Cir. 1971); *McCauley v. United States,* 470 F.2d 137 (9th Cir. 1972); *United States v. English,* 521 F.2d 63 (9th Cir. 1975); cf. *Johnson v. Serra,* 521 F.2d 1289 (8th Cir. 1975); *Murphy v. Eaton,* 444 F.2d 317 (6th Cir. 1971); *William's v. United States,* 435 F.2d 804 (1st Cir. 1970). *Murphy, supra,* and *Willmore, supra,* were personal injury actions. The rest of the cases cited were wrongful death actions based on federal claims. All of the cited cases applied the substantive damages law of the state.

Several state courts have also allowed the fact finder to consider inflation when determining future damages.

*Schnebly v. Baker,* 217 N.W.2d 708, 726 (Iowa 1974) ; *DeWitt v. Schuhbauer,* 287 Minn. 279, 177 N.W.2d 790 (1970) ; *Plourd v. Southern Pacific Transportation Corp.,* 513 P.2d 1140, 1146 (Ore. 1973) ; *Beaulieu v. Elliott,* (Alaska 1967), 434 Pac.2d 665.

In *Schnebly, supra,* one of the damages, was the cost of future medical care. The Iowa court realized that considering the effect of inflation would be somewhat speculative but they also realized that to do otherwise would not fully compensate victims for their losses. *Schnebly, supra,* at 727, 728.

In Wisconsin damages are,

". . . given to make whole the damage or injury suffered by the injured party. *White v. Benkowski,* 37 Wis. 2d 285, 290, 155 N.W.2d 74 (1967).
". . . The plaintiffs are not required to ascertain their damages with mathematical precision, but rather the trier of fact must set damages at a reasonable amount." *White, supra,* at 289.

In arriving at an adequate compensation figure, any award for future damages is to some degree speculative. Certainly awards for future pain and suffering or the use of mortality tables to determine life expectancy are speculative. Failure to consider inflation also requires speculation that inflation of medical expenses will not continue to occur during the course of future medical treatment. This assumption is highly conjectural because the parties stipulated that medical costs have risen on an average of five percent per year during the seven years preceding the trial.

The trial court discounted Ms. Cords' recovery to present value. In effect the trial court estimated the future return from Ms. Cords' recovery and discounted it accordingly, but the trial court refused to estimate any effect from inflation. However, inflation may be taken

into account by the fact finder as a separate factor to arrive at an amount that will fairly compensate the victim for required future medical expenses.

In this case the trial court refused to consider stipulated evidence concerning rising medical costs because of the "state of speculation of our economy." This is precisely the situation where inflation affects costs. The refusal to take inflation into account for that reason was an abuse of discretion. On remand, the trial court will not be limited to mathematically applying a five percent annual inflation rate indefinitely into the future to determine future damages. But the court should consider inflation as it seems reasonably probable in reaching a reasonable damage figure. The court's determination will control absent an abuse of discretion.[7]

## IV. ADEQUACY OF $300,000 FOR JANE CORDS' GENERAL DAMAGES.

The respondent, Jane Cords, argues that $300,000 is inadequate to compensate her for general damages.

"A trial court finding that a jury award is excessive will be overturned only for an abuse of discretion. *The test to determine abuse is whether, if the trial court had been sitting as the sole finder of fact and had fixed the plaintiffs' damages in the disputed amount, this court would still disturb the findings. If there is a reasonable basis for the trial court's determination as to the proper amount it will be sustained."* Lutz v. Shelby Mutual Ins. Co., 70 Wis.2d 743, 759, 235 N.W.2d 426, 435 (1975).[8]

In reviewing damage awards granted in either a bench or jury trial this court does not substitute its judgment

---

[7] *McCrossen v. Nekoosa Edwards Paper Co.,* 59 Wis.2d 245, 208 N.W.2d 148 (1973).

[8] A similar approach was followed in *Moritz v. Allied American,* 27 Wis.2d 13, 133 N.W.2d 235 (1965).

for that of the fact finder, but rather determines whether the award is within reasonable limits. *Olson v. Siordia*, 25 Wis.2d 274, 285, 130 N.W.2d 827, 833 (1964).

Normally ". . . in determining whether there is a reasonable basis for the trial court's determination we are aided by its own analysis of the evidence and appraisal of the award." *Gleason v. Gilihan*, 32 Wis.2d 50, 59, 145 N.W.2d 90 (1966). But in this case the trial court gave no reasons for the award in the memorandum decision so the entire record must be reviewed as a matter of first impression. *Bach v. Liberty Mutual Fire Ins. Co.*, 36 Wis.2d 72, 83, 152 N.W.2d 911 (1967); *Ballard v. Lumberman's Mut. Casualty Co.*, 33 Wis.2d 601, 607, 148 N.W.2d 65 (1967).

The evidence is still viewed in the light most favorable to support the damage award. *Grassl v. Nelson*, 75 Wis.2d 107, 114, 248 N.W.2d 403 (1976).

On May 2, 1970 Jane Cords was an athletic University of Wisconsin, Madison, sophomore who planned to major in physical education. As a result of her fall, Ms. Cords lost consciousness, both of her lungs were ruptured and collapsed, her right wrist was fractured and her spinal cord was injured resulting in permanent paraplegia and loss of feeling below the chest cage. After the accident she contracted phlebitis in her left leg and began to suffer from a permanent condition of uncontrolled muscle cramps that occasionally threw her out of bed or off her wheelchair. She has undergone major spinal surgery and a long period of therapy to learn to cope with paraplegia. She has no control over her bowels or bladder and is permanently catheterized. She is exposed to the bladder and skin problems which often accompany paraplegia.

Her medical expenses will probably average between $600–$700 per year plus an average of fifteen days in a hospital at a 1972 cost of $175.00 per day. Her wheel-

chair will cost $400–$500 and last from three to four years. The normal life expectancy of a woman of Ms. Cords age was 53.1 years at the time of trial. This estimate is reduced from ten to forty percent for paraplegics.

In their brief Ms. Cords' counsel contend without citing any authority that awards of $650,000 to over $900,000 have been sustained for such damages and that an award in excess of $450,000 would be fair and reasonable.

Comparison of verdicts from other cases is an imperfect analogy which at best only offers guidelines to a solution. *Springen v. Ager Plumbing & Heating, Inc.,* 19 Wis.2d 487, 493, 120 N.W.2d 692 (1963). *Lutz v. Shelby Mut. Ins. Co.,* 70 Wis.2d 743, 759, 235 N.W.2d 426, 435 (1975). Awards averaging $451,090 have been made for similar injuries in other states, but that average includes cases with quadraplegia a more serious injury than paraplegia. Furthermore, fifty percent of the awards for paralysis from spinal injuries range from $175,000 to $555,000.[9]

Ms. Cords award could have been higher, but $300,000 damages for these injuries is not unreasonably low.

In considering these matters on remand, because the cases were tried by the court without a jury, a new trial with the presentation of all evidence is not necessary. The trial court may review the record in view of this opinion and make such new findings of fact as it deems proper. The trial court may hear additional arguments of counsel if it concludes such argument is necessary or helpful.

*By the Court.*—The judgment in favor of John Boyle and Norina Boyle is affirmed. The judgment dismissing the causes of action of Roland Henry and Sue Henry is

[9] Personal Injury Valuation Handbooks, Vol. I, No. 138, Coccyx, sacrum and spinal cord injuries. (1971). See also, 12 A.L.R.3d 117.

reversed and remanded for further proceedings consistent with this opinion. The judgment in favor of Erwin Cords and Jane Cords is reversed and remanded for further proceedings consistent with this opinion.

CONNOR T. HANSEN, J. *(dissenting)*. Because I believe the majority errs on three of the four questions presented, I respectfully dissent.

## MINISTERIAL DUTY

The opinion of the majority departs substantially from this court's previous understanding of the individual tort liability of public officers. As the court recognizes, in negligence actions against individual officers, the rule is immunity, the exception, liability.[1] In finding the defendant Anderson liable, the court greatly enlarges the exception which holds an officer liable for the negligent performance of purely "ministerial" duties.

The majority correctly states the rule that:

". . . A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister v. Board of Regents*, 72 Wis.2d 282, 301, 240 N.W.2d 610 (1976).

The majority then applies this rule to the following facts:

". . . Anderson knew the terrain at the glen was dangerous particularly at night; he was in a position as park manager to do something about it; he failed to do anything about it . . . ."

[1] The opposite rule prevails in actions directly against the governmental unit. *Holytz v. Milwaukee*, 17 Wis.2d 26, 115 N.W.2d 618 (1962).

From this the majority somehow arrives at the conclusion that Anderson has breached a ministerial duty. I am unable to comprehend this reasoning.

A ministerial duty involves ". . . the mere performance of a prescribed task . . . ." *Meyer v. Carman*, 271 Wis. 329, 332, 73 N.W.2d 514 (1955). The duty must be " 'positively imposed by law;' " the time, manner and conditions of its performance must be " 'specifically designated' "; and the duty of performance must not be dependent upon the officer's judgment or discretion. *Meyer v. Carman, supra*, at 332. The duty must not involve ". . . the exercise of the officer's judgment upon the propriety of the act, . . ." *Stevens v. North States Motor, Inc.*, 161 Minn. 345, 348, 201 N.W. 435 (1925).

Applying this exception in a previous case, this court flatly held that the accommodation of competing interests inherent in decisions regarding the safety of public premises is discretionary. In *Meyer v. Carman, supra*, this court rejected the argument that a school board's statutory obligation to maintain school grounds in a "safe" condition was ministerial. The court said:

"At first blush it might appear that the duty to keep the school grounds 'safe' is ministerial in character, but it is apparent on closer analysis that a great many circumstances may need to be considered in deciding what action is necessary to do so, and such decisions involve the exercise of judgment or discretion rather than the mere performance of a prescribed task . . . ." *Meyer v. Carman, supra*, 331, 332.

The state and its employees must exercise the same judgment in deciding what steps shall be taken to warn or protect park visitors against dangerous natural conditions. As heretofore conceived by this court, therefore, and as expressed in *Meyer, supra*, the "ministerial duty" exception would not have embraced the alleged omissions of the defendant Anderson.

To avoid this result, the majority has apparently fashioned a new and expanded concept of ministerial duties. The court's reasoning appears to be that a duty ordinarily discretionary in nature may become ministerial under certain circumstances. The majority thus abandons the holding of prior cases that discretionary and ministerial functions are entirely different, and recognizes, apparently as does Prosser, that the difference is essential one of degree. Prosser, *Law of Torts* (4th ed. 1971) (hornbook series), 987, 990, sec. 132. The difference in degree required to distinguish a discretionary duty from a ministerial duty is apparently to be determined by the then majority of this court.

The new approach works a second and perhaps more ominous change. For liability to arise, the duty must be " 'imposed by law,' " and the time, manner and conditions of its performance must be " 'specifically designated.' " *Meyer, supra,* 332. This has always been understood to require an express and specific mandate, whether embodied in statute, regulation, a contract, or the instructions of an employee's superiors.

Now it appears that ministerial duties may be inferred from the inherent nature of an employee's position, or perhaps from the common-law duties of the state as a landowner. Adherence to instructions and careful performance of assigned duties are no longer enough. The public employee must now discern and fulfill duties inherent in his post, without an objective referent and, apparently, even when his superiors have adopted contrary policies.

There may well be some instances when a subordinate public employee has a duty to warn his superiors of a danger. Such instances could be those where a subordinate public employee learns of a great hazard *and* where the hazard is not readily apparent to those who enter the land *and* where the hazard is unknown to his

superiors and those in a position to warn of the danger and take precautions against it. Under these circumstances, it might be said the employee has an absolute and inherent duty to advise his superiors of the danger. But the opinion of the majority does not limit the employee's duty to such cases, and this case is certainly not one of them.

The court offers no indication that the obviousness of the hazard or prior knowledge on the part of higher officials will relieve an employee of responsibility. Indeed there is nothing to mark the outer bounds of the potential liability thus unleashed. Nevertheless, I believe some such limitation is inherent in the concept of ministerial duties, and that even as reformulated by the majority, the concept can have no application to this defendant.

I believe the majority mistakes both the scope of Anderson's authority and the nature of the hazard involved. The majority holds that Anderson breached a duty "to either place warning signs or advise superiors of the conditions." They acknowledge, however, that Anderson was without power to erect warning signs or to close trails without his superiors' approval. His alleged negligence must lie, therefore, in his failure to "advise superiors of the conditions."

The majority says "[i]t was his job to make recommendations for public safety at the glen." Anderson's testimony on this point was inconsistent. Stanley Welsh, Administrator of the Division of Forestry and Recreation at the time of the injuries, testified that a park manager had no particular responsibility to report hazardous and unsafe conditions to his superiors.

Even if Anderson had such a duty, it did not oblige him to remind his superiors of conditions with which they were already familiar. Welsh was two levels above Anderson in the supervision of the Glen. Welsh had not

been on the upper trail, but he was familiar with the Glen and its terrain. Directly below Welsh, in staff capacities, were Alta Ehly, Director of the Bureau of Parks and Recreation, and Lowell Hansen, Assistant Bureau Director, both of whom were familiar with the Glen. Although Ehly had not been to the particular site of the accidents, Hansen had been there many times.

Chief parks naturalist, George Knudsen, who was intimately familiar with the Glen's topography, had reported in 1969, that slippery needles created a hazard along sections of the upper trail. He said that his report had been sent to Anderson's immediate superior and to Hansen. Under these circumstances, there would have been no purpose in Anderson reminding his superiors that the trails were but a step away from a dangerous fall.

Moreover, the hazard was patently clear to park visitors. Anderson did not come upon rattlesnakes in the underbrush or quicksand in the streambed or any other lurking danger which none of his superiors knew about. He encountered the manifest danger which is inescapably clear to every hiker along the path, which was well-known to his superiors and left in its present condition by deliberate and calculated decision of them to maintain the Glen in its natural condition.

A possessor of land has no duty to warn of dangers which are perfectly obvious to users or which can reasonably be expected to be understood and appreciated. *Scheeler v. Bahr,* 41 Wis.2d 473, 480, 164 N.W.2d 310 (1969) ; Prosser, *supra,* 394, sec. 61. In *Scheeler v. Bahr, supra,* 478, the court quoted with approval from the Restatement, 2 *Torts* 2d, 203, sec. 339, Comment *j:*

" 'There are many dangers, such as those of fire and water, or of falling from a height, which under ordinary conditions may reasonably be expected to be fully understood and appreciated by any child of an age to be allowed at large.' "

2 Harper and James, *Law of Torts,* 1489, 1490, sec. 27.13, offers as an example of obvious dangers, for which no warning need be given, the "stones and slopes in a New England field." The perils of the clifftop paths in the Glen were far more evident. Any hiker along the upper path would appreciate the danger of falling. The plaintiffs in the instant case were particularly sensible of the risk.

As the group hiked in along the gorge trail during the day, Dean Schraufnagel had explained to them the geological characteristics of the sheer cliff walls. Later, Norina Boyle had slipped partway down the western slope of the gorge, catching herself on a tree, and had related the experience to the group. Before sunset, Jane Cords and Norina Boyle had looked over the cliff into the gorge and Jane Cords had said "Can you imagine falling?" or "What if you fell from up here?" Both girls noticed how close the trail came to the cliff, and Norina Boyle was aware that if she walked the wrong way, she was likely to go over the edge. This evidence shows that plaintiffs not only had reason to appreciate the danger, but that they did appreciate it.

The opinion of the court seems to harbor the notion, advanced by the plaintiffs, that the particular topographical configuration at the point of Norina Boyle's fall constituted a "hidden trail hazard" or an "ominous human trap." At the point of the fall, the trail passes immediately along what was described as a "chute" or an "undercut" dropping sharply to the edge of the gorge. In the darkness, Norina Boyle apparently slipped or stepped off the trail, down this chute and over the precipice. By day, the slope of the chute is plainly visible from the adjacent path. Jerry Rousseau, a member of the group, in describing this point, said "[t]here's a trail along the side here . . . [T]he trail is right next to the edge [of the gorge]."

Nothing distinguishes this "undercut" from other formations along the clifftop trail. Parfrey's Glen is a setting of unique and irregular geological phenomena, and the plaintiffs knew it. That is why it is preserved. The undercut is not unusually sinister or trap-like or noteworthy. Further, there is no indication that this formation had ever attracted the attention of Anderson, or that the hazard here was any greater than at other places where the path follows the rim of the gorge.

Rather, it was precisely the type of hazard any visitor would anticipate along the trail, the type of hazard of which the plaintiffs were fully conscious. There is no duty to warn of such dangers.

I would reverse the judgment of the trial court on this issue.

## RESCUE DOCTRINE

The trial court found Jane Cords 40 percent negligent and Sue Henry 60 percent negligent in attempting the descent during which they fell. The majority of this court now would fashion a "rescue rule" adaptable to the Wisconsin comparative negligence doctrine.[2] This is accomplished by first referring to authorities which recognize the contributory negligence doctrine. These authorities hold that one is not guilty of contributory negligence in exposing himself to danger of a rescue unless the intervention was performed under circumstances which would make it rash or reckless or wanton in the judgment of the ordinarily prudent person.

The majority accomplishes the transition by simply changing the words "rash or reckless or wanton" to

---

[2] The existence of the rescue doctrine in other jurisdictions was acknowledged in *Central Wis. Trust Co. v. Chicago & N.W.R. Co.*, 232 Wis. 536, 543, 287 N.W. 699 (1939); and *Brady v. Chicago & N.W.R. Co.*, 265 Wis. 618, 62 N.W.2d 415 (1954), but the doctrine has never been applied by this court.

"not unreasonable or unreasonably carried out." They then conclude the trial judge erred in not applying the rescue rule, and reverses and remands as to this issue.

I do not believe the integration of the rescue rule in the Wisconsin comparative negligence doctrine is that simple nor do I believe it is applicable to the facts of this case. It also appears the majority is of the opinion that the trial court "confused" the emergency rule with the rescue rule. I do not so read his decision. Before one can be entitled to the benefits of either rule, it must first be determined as a fact that the person was confronted with an emergency or engaged in rescue.

In the instant case tried to the court, the trial court found, as a fact, that Cords and Henry were not engaged in a rescue at the time they sustained their injuries, and hence not entitled to the benefits of the rescue rule, and proceeded to determine the comparative negligence of the parties. In my opinion, the evidence supports this factual determination by the trial judge.

Webster's International Dictionary, 2nd ed., defines *rescue* as: ". . . deliverance or aid in delivering from restraint, violence or danger; . . ." The American Heritage Dictionary defines it as: "To save, as from danger or imprisonment."

The trial court was correct in refusing to apply the rescue doctrine. Instead, the trial court properly considered the girls' actions in attempting the descent, the urgency of the situation, the interval between Norina Boyle's fall and the attempted descent, the fact that Norina Boyle was being attended, and the warnings not to descend, as factors to be weighed in determining whether each of the parties had exercised reasonable care under all of the prevailing circumstances.

The record shows that at the time of the attempted descent, Norina Boyle had been found by other members of the party and was being attended by Tom Tibbits and

Tom Nelson. Jerry Rousseau climbed back up to the campsite and instructed Jane Cords and Sue Henry to remain there while he went for help. Although he mentioned that Sue Henry's experience as a nurse's aide might make her useful if help *was* needed, Rousseau emphasized that the girls should stay by the fire and that they would be called if needed. Someone called up from below and warned Jane Cords to stay by the fire.

After ten or fifteen minutes, Sue Henry decided to disregard these instructions and to attempt the descent in the darkness. The trial court found that she was "showing the signs of ingestion of alcoholic beverages;" Tom Tibbits said she was "pretty inebriated." Jane Cords, whose initial reaction was "oh no, we'll never make it," decided to accompany Henry. Before they had gone very far, both girls fell. Shortly thereafter, rescue personnel from the Sauk county sheriff's office and nearby Devil's Lake state park arrived on the scene. I believe that this evidence amply supports the trial court's allocation of negligence.

If Tibbits, Nelson or Rousseau had been injured in their initial descent to locate, assist and arrange for the rescue of Norina Boyle, an appropriate factual situation might well have been presented to consider the application of the rescue rule.

The policy of the law should be to encourage rescue and in the appropriate case the rule should be applied. This is not such an instance and the trial court should be affirmed on this issue.

## INFLATION

The majority holds that it is reversible error to fail to consider the possible effect of inflation on a plaintiff's future medical expenses. Whether a present award will have sufficient purchasing power to defray future medi-

cal expenses will depend on subsequent changes in price structure, the available rate of return, the discount rate employed, and the relation of these factors to one another. In making this difficult calculation, the trial court declined to extrapolate the increase in medical expenses in the seven years preceding trial throughout Jane Cords' expected lifetime.

Although, as the court points out, courts in some other jurisdictions have *allowed* the fact finder to assume that inflation will persist, I am aware of no decision *requiring* such an assumption. Apparently the majority concludes that inflation has become an eternal and irreversible fact of economic life. There were some who shared this belief prior to 1929, and the great depression and intermittent recessions since that time have taught us it is not necessarily so.

By reversing the award, the majority implicitly determines that public efforts to stem the tide of inflation in general, and to control medical costs in particular, will be unsuccessful, and also determines that Jane Cords' expenses will not some day be assumed by a system of national health insurance. This is a matter of conjecture. The future, of course, is always conjectural. But this court has no crystal ball, and I see no sound reason to substitute the speculation of this court for that of a trial court. I would affirm the holding of the trial court on this issue.

In conclusion, I suggest the result reached by the majority is a classic example of the familiar maxim that hard cases make poor law. Most disturbing is the expansion of the liability of public officers. The court's holding goes far toward making the state an insurer against all injuries in state parks, forests, and other natural areas. I can perceive no sensible limit to the majority's reasoning that "[t]here can be no policy of leaving it alone when such an obvious danger exists."

State lands are studded with obvious natural conditions which could endanger the unwary. Indeed, it is often the concentration of such natural curiosities which makes an area desirable for acquisition and which attracts visitors. Must a warning sign now grace every steep slope, jagged rock, and tottering tree? What of lightning, frostbite, fires, floods, bears, contaminated water, thin ice, and every other imaginable hazard to the careless outdoorsman? On the outing involved in this case, one member of the group paused to climb a tree. Should he have been warned of the danger of a fall? If the state is to avoid liability for injuries from these and every other hazard, the legislature might be well advised to heed the suggestion of *Holytz v. Milwaukee, supra,* 40, and "reinstate immunity."[3]

I am authorized to state that Mr. Justice HANLEY and Mr. Justice ROBERT W. HANSEN join in this dissent.

---

[3] Sec. 895.45 (4), Stats., although not applicable to the instant case, was enacted by ch. 333, sec. 182c, Laws of 1973, and provides as follows:

"*895.45 Timeliness, definition of claimant, notice and limited ability.*

". . . .

"*(4)* The amount recoverable by any person or entity for any damages, injuries or death in any civil action or civil proceeding against a state officer or employe under this section shall not exceed $100,000. No punitive damages shall be allowed or recoverable in any such action."

Also, some states have enacted statutes specifically excluding liability for injuries resulting from natural causes or conditions on state lands. *Cal. Gov't Code,* sec. 831.2 (Deering, 1973); *Utah Code Annot.,* sec. 63-30-10 (11) (1968).