Gary T. CHERNETSKI, Plaintiff-Respondent,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a/k/a
American Family Insurance Group, a Wisconsin
Corporation, and Eva Wall, Defendants-Appellants.

Court of Appeals

*No. 92–1418. Submitted on briefs August 11, 1993.—Decided
March 8, 1994.*

(Also reported in 515 N.W.2d 283.)

70

For the defendants-appellants the cause was submitted on the briefs of *Mark J. Mingo* of *Mingo & Yankala, S.C.*, of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *Edwin C. Rachow*, of Elm Grove.

Before Sullivan, Fine and Schudson, JJ.

SULLIVAN, J. Eva Wall and her liability insurer, American Family Mutual Insurance Company (collectively "Wall"), appeal from an amended judgment that awarded damages to Gary T. Chernetski for injuries sustained in an automobile-bicycle collision. On appeal, Wall challenges the trial court's finding that she was 95% causally at fault for the collision. In particular, Wall argues that the trial court erroneously refused to consider § 346.25, STATS., the right-of-way statute, which governs right of way between motorists, bicyclists and pedestrians at places other than crosswalks. Wall also contends that damages were excessive. Because we conclude that § 346.25 was inapplicable to the situation, we affirm the trial court's conclusion on liability. With regard to damages, we conclude that Chernetski failed to meet his burden of proof on a charge of $293 for treatment. In all other respects, we affirm the trial court's conclusion on damages.

This automobile-bicycle collision occurred at the intersection of West Juneau Avenue and North 4th Street in the City of Milwaukee on August 4, 1987. The intersection is controlled by traffic signals. Wall, oper-

71

ating her vehicle, was eastbound on Juneau Avenue and turned left to proceed north on 4th Street. At approximately the same time, Chernetski, operating his bicycle, was westbound on Juneau Avenue and entered the 4th Street intersection. The vehicle and bicycle collided, causing injury to Chernetski. At the time of the accident, both eastbound and westbound traffic on Juneau Avenue had a green light.

■

Chernetski brought a negligence action against Wall and the case was tried to the court. In her defense, Wall argued that Chernetski was negligent in failing to yield right-of-way as provided by § 346.25, STATS. The trial court, however, applied § 346.02(4), STATS., without regard to § 346.25, STATS. At issue is the correct statute or legal standard to be applied to the facts. This is a legal issue which we determine independently of the trial court's conclusions. *See State v. Lemay,* 155 Wis. 2d 202, 208, 455 N.W.2d 233, 235 (1990).

### RIGHT OF WAY

Section 346.18, STATS., provides that "[t]he operator of a vehicle within an intersection intending to turn to the left across the path of any vehicle approaching from the opposite direction shall yield the right-of-way to such vehicle."[1] Section 346.02, STATS., provides, in part:

---

[1] Section 340.01(51), STATS., defines "right of way" as the "privilege of the immediate use of the roadway." Subsection (54) defines "roadway," in relevant part, as the "portion of a highway between regularly established curb lines." Section 346.01, STATS., provides that the definitions of § 340.01 apply to Chapter 346 unless a different definition is specifically provided.

**(4)** APPLICABILITY TO PERSONS RIDING BICYCLES AND MOTOR BICYCLES. (a) *Subject to the special provisions applicable to bicycles*, every person riding a bicycle upon a roadway is granted all the rights and is subject to all the duties which this chapter grants or applies to the operator of a vehicle, except those provisions which by their express terms apply only to motor vehicles or which by their very nature would have no application to bicycles.

(Emphasis added.)

Thus, barring some "special provision[ ] applicable to bicycles," the present situation would be governed by the requirements of § 346.18, STATS., and Wall would have been required to yield right-of-way to Chernetski. Wall argues that § 346.25, STATS., is a "special provision" which trumps the general rule found in § 346.02(4)(a). Section 346.25 provides:

> **Crossing at place other than crosswalk.** Every pedestrian or bicyclist crossing a roadway at any point other than within a marked or unmarked crosswalk shall yield the right-of-way to all vehicles upon the roadway.

In its memorandum decision, the trial court concluded that Wall's reliance upon § 346.25, STATS., was misplaced because Chernetski was operating his bicycle *upon the roadway* at the time of the accident, and was not "crossing a roadway."

The question that this court must answer is what the legislature intended, in § 346.02(4)(a), STATS., when it provided that a person riding a bicycle upon a roadway has all of the rights and duties of a motorist, but "*subject to special provisions applicable to bicycles*." Specifically, did the legislature intend § 346.25, STATS.,

to be a "special provision" that acted as an exception to the general rule. We conclude that it did not.

Statutory interpretation presents this court with a question of law, which we decide *de novo*, without deference to the decision of the trial court. *See Pulsfus Poultry Farms v. Town of Leeds*, 149 Wis. 2d 797, 803-04, 440 N.W.2d 329, 332 (1989). When construing a statute, our first resort is to the language of the statute itself. *Id.* at 804, 440 N.W.2d at 332. In addition, we also consider related sections. *Id.* If there exists no ambiguity in the statutory language, this court will look no further. *Id.* When an ambiguity arises, however, from the language of a statute, or from the interaction of separate statutes, we will "examine the scope, subject matter, and object of the statute," including legislative history, to determine the legislative intent. *Id.* at 804-06, 440 N.W.2d at 332-33. "A statute is ambiguous . . . if it is 'capable of being interpreted by reasonably well informed persons in either of two or more senses.' " *Id.* at 804, 440 N.W.2d at 332 (citation omitted).

We conclude that an ambiguity arises when §§ 346.02(4)(a) and 346.25, STATS., are read together. One reasonable interpretation of the two statutes could lead to the conclusion that § 346.25 must be read as an exception to § 346.02(4)(a) because it is a statute that specifically mentions bicycles, and although Chernetski was passing through an intersection, he was technically "crossing" a road at a place other than a crosswalk. Another equally reasonable conclusion, however, is that § 346.02(4)(a) envisions that the exceptions to the rule must be "specific provisions for bicycles" *operating upon a roadway*. Under that interpretation, § 346.25 would arguably be more akin to a

"jaywalking" statute than a rule applicable to a bicyclist upon a roadway. Because we conclude that the statutes are ambiguous, we examine the scope, context and history of the statutes in question.

At the time § 346.02(4), STATS. (1957),[2] was enacted, the only statutes within ch. 346 that could be construed as "special provisions applicable to bicycles" were § 346.79, STATS. (1957) ("Special rules applicable to bicycles") and 346.80, STATS. (1957) ("Riding bicycle on roadway"). Like the current versions of the same statutes, §§ 346.79 and 346.80 provided rules for bicycles operating upon highways and roadways; the rules include restrictions on passengers and parcels that may be carried upon a bicycle, and the requirement that, subject to a few exceptions, bicyclists ride on the right side of the roadway and ride "single file."

In contrast to those bicycle statutes, § 346.25, STATS. (1957), did not contain any reference to bicycles. To put § 346.25 in context, we refer to two related statutes—§§ 346.23 and 346.24, STATS. (1957). Section 346.23 provided the rule of right-of-way between vehicles and pedestrians crossing at a *controlled* intersection or crosswalk. Section 346.24, STATS., provided the rule of right-of-way between vehicles and pedestrians crossing at an *uncontrolled* intersection or crosswalk. Finally, § 346.25 governed the rule of right-of-way between vehicles and a pedestrian crossing "at any point other than within a marked or unmarked crosswalk." None of these statutes referred to bicyclists.

In 1973, the legislature enacted § 346.804, STATS. (1973), which provided that, where local authorities permit bicyclists to ride on sidewalks, bicyclists must

---

[2] Section 346.02(4), STATS. (1957), was identical to the current § 346.02(4)(a), STATS. (1991-92).

yield right-of-way to pedestrians on the sidewalks. That statute was silent, however, on whether the bicyclist could use a crosswalk, and if so, what rules of right-of-way the bicyclist was to follow, with respect to vehicles, when coming off of a sidewalk and into a crosswalk. As explained above, a pedestrian's rights in a crosswalk were explicitly covered by §§ 346.23 and 346.24, STATS., and outside a crosswalk by § 346.25, STATS.

In 1985, in an apparent attempt to clarify the right-of-way of bicycles operating within a crosswalk, the legislature amended various pedestrian right-of-way statutes within ch. 346, including §§ 346.23-25, STATS., to include bicyclists. *See* 1985 Wis. Act 69. The Legislative Reference Bureau's analysis of the bill presented to the legislature explained:[3]

> This bill provides that a person operating a bicycle in a crosswalk in a manner which is consistent with the safe use of the crosswalk by pedestrian traffic has the same right-of-way privileges over other vehicular traffic as a pedestrian in a crosswalk. . . .

In addition, the prefatory language to 1985 Wis. Act 69 indicates that it was "AN ACT . . . relating to use of bicycles on sidewalks and in crosswalks . . . ."

Nothing in the act itself explicitly stated that the legislature intended to affect the rights of persons operating a bicycle *upon a roadway*. Nor did the act forbid bicyclists to ride upon the roadway where sidewalks and crosswalks were available. To the contrary, rather than taking away rights of a bicyclist operating upon a

---

[3] An analysis of a bill by the Legislative Reference Bureau is indicative of legislative intent. *See McLeod v. State*, 85 Wis. 2d 787, 792, 271 N.W.2d 157, 160 (Ct. App. 1978).

roadway, the legislature explicitly gave to bicyclists operating upon sidewalks and in crosswalks the same rules of right-of-way that had previously applied only to pedestrians.

When read as a whole, we conclude that the legislature, in enacting and continuing to amend various sections of ch. 346, intended to create statutes applicable to two different types of bicyclists—one that chooses to use the roadway, as would any other vehicle, and another that chooses to act as a pedestrian by riding upon sidewalks and within crosswalks. The rules of the road, including rules of right-of-way, may differ depending upon the capacity in which the bicyclist chooses to operate. Namely, the statute at issue in this case, § 346.25, STATS., as well as §§ 346.23-24, STATS., were intended by the legislature to be applicable to bicyclists acting in a "pedestrian-like" capacity.

In contrast, as provided by § 346.02(4)(a), STATS., where a bicyclist operates upon a roadway, as would a motor vehicle, the rules governing the rights and duties of a vehicle are applicable to the bicyclist. Of course this general rule is "subject to special provisions applicable to bicycles," but only provisions *intended* to be applicable to bicycles *operating upon a roadway*. Clear examples of such statutes are § 346.79, STATS. ("Special rules applicable to bicycles"), which by its plain language applies to bicycles "upon a highway," and § 346.80, STATS. ("Riding bicycle upon roadway"), which applies to bicycles "upon a roadway."

In conclusion, the trial court did not err in refusing to consider § 346.25, STATS., as it related to the duty to yield right-of-way because that statute was inapplicable to the situation due to the fact that Chernetski was operating upon the roadway.

## DAMAGES

Wall raises several damages issues. We discuss each in turn.

■

(1) *Charges of $293 for treatment of Chernetski's back by Sanford Baim, M.D.* Dr. Baim did not testify. Gary N. Guten, M.D., an orthopedic surgeon who specializes in knee injuries, was Chernetski's treating physician. Dr. Guten testified that the charges were reasonable but that he could not give an opinion whether they were necessarily incurred. The trial court excluded them. The parties concede, however, that the trial court's award of $4,432.16 for medical expenses included Dr. Baim's charge. Wall argues that it should be excluded because it was not proven. Chernetski asserts that the trial court changed its mind between the time of trial and the filing of its decision.[4] The burden of proof to establish that the charges were necessarily incurred for Chernetski's care and treatment rested upon him. *See Michalski v. Wagner*, 9 Wis. 2d 22, 31, 100 N.W.2d 354, 359 (1960). The trial court made no statement in its decision that it intended to change its ruling excluding the charge. We conclude that the record does not establish that Chernetski sustained his burden of proof and, therefore, the award must be reduced to the extent of Dr. Baim's $293 charge.

(2) *Subrogation claim of Blue Cross and Blue Shield United of Wisconsin (Blue Cross).* During the trial, Wall objected to admission of certain medical charges, arguing that some of the medical expenses had been paid by Chernetski's health insurer, Blue

---

[4] The trial court excluded the charges at trial on December 19, 1991. It filed its memorandum decision on April 14, 1992.

Cross. The court deferred ruling on the objection. Though Wall raised the issue in her proposed findings of fact and conclusions of law, the trial court made no subsequent mention of the matter in its memorandum decision. It appears from the record on appeal that Wall did not raise the issue in her motions after the verdict.

On appeal, Wall argues that this court should preclude Chernetski from recovering any medical expenses because Chernetski failed to join Blue Cross as a party pursuant to § 803.03(2), STATS. (requiring joinder of party with subrogated rights). At the outset, we note that Wall has not pointed to any evidence *presented at trial*, aside from the objection to the evidence, that could support her contention that Blue Cross *has* a subrogated right to any medical expenses. Wall bases her argument on letters submitted to the trial court after the close of evidence. The letters were addressed to Wall's attorney and were written by an attorney who apparently represented Blue Cross. One letter was appended to Wall's proposed findings of facts and law. Another letter, submitted to the trial court at a later date, indicates that Blue Cross believed that its subrogation interest in the matter amounted to $698.80.

Even if we were to assume that Blue Cross has a subrogated right to a portion of Chernetski's award, Wall's brief does little to set forth the legal analysis necessary for this court to conclude that preclusion of damages is the appropriate remedy for a failure to abide by the statute.

Because Wall chose to address the issue only after the close of evidence, and because of the lack of analysis offered by Wall both in the trial court and on appeal, we

decline to address the issue further. We conclude that Wall's argument was not properly developed in the trial court and is not properly developed on appeal. *See In re Estate of Balkus*, 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985).

█

(3) *Pre-existing condition.* Wall argues that the trial court failed to consider Chernetski's pre-existing condition in making its findings of medical expense damages and in assessing $90,000 for personal injuries including permanent residuals. Wall argues, without citation to authority, that the trial court's failure to mention the previous injury rendered its awards excessive as a matter of law. We are unwilling to infer, from the trial court's failure to mention a pre-existing condition, that it failed to consider it. The evidence was before the court and we conclude, absent a showing to the contrary, that the judge considered all of the evidence. Furthermore, § 805.17(2), STATS., requires a trial court to set forth findings of ultimate fact, as does a jury when it renders its verdict, *see* § 805.12(1), STATS. A trial court finding of ultimate fact need not be supplemented by commentaries on the evidence or reasons for which the findings are made.

(4) *Excessiveness of the award for past and future disability and past and future pain and suffering.* In its memorandum decision, the trial court concluded, "[f]or past and future disability the Court finds that the amount of $90,000.00 will fairly and reasonably compensate plaintiff for past, as well as future, pain and suffering." Wall argues that the trial court's award was excessive.

█

This court will sustain a damages award if it is within reasonable limits and is supported by credible

evidence in the record. *Gerth v. American Star Ins. Co.,* 166 Wis. 2d 1000, 1009, 480 N.W.2d 836, 840 (Ct. App. 1992). We view the evidence in the light most supportive of the award. *Cords v. Anderson,* 80 Wis. 2d 525, 552-53, 259 N.W.2d 672, 685 (1977).

The evidence shows that Chernetski, born July 8, 1957, had been employed as a letter carrier for the U.S. Postal Service for over seven years prior to the collision. His life expectancy at the time of the accident was 40.5 years. Chernetski was an athletic person who ran and biked prodigiously. In high school he set a record for a cross-country event. In 1984, he made a bicycle trip of 500 miles in five days. For awhile after the collision, Chernetski did not bike and was advised by Dr. Guten to cut back on running and biking. On August 4, 1987, Dr. Guten found discomfort in the knee evidenced by tenderness and crepitation or grinding. In a visit of March 2, 1988, Dr. Guten again found traumatic chondromalacia. He advised Chernetski not to run if pain persisted and to obtain a patella brace. In a visit of August 23, 1989, Dr. Guten again found roughness in the kneecap and ordered a bone scan.[5] Based on a subsequent examination, and the result of the bone scan, Dr. Guten supplemented his finding of chondromalacia with a new finding of chronic tendinitis. He and Chernetski discussed at length various treatment alternatives. Dr. Guten recommended that Chernetski learn to live with his pain and to be careful with knee bending. This includes recreational activities as well as stair climbing, kneeling, and heavy activities at work. Dr. Guten found a two percent partial and permanent disability of the right knee due to residual scar tissue

---

[5] This scan is a radioactive test that measures inflammation in a joint. Chernetski's hips and knees were scanned.

about the kneecap, and that this condition limits repetitive knee-bending activities.[6]

We conclude that the trial court's award of $90,000 for pain, suffering and future disability is supported by credible evidence. Accordingly, we affirm the award.

In conclusion, we affirm the trial court's finding of liability; we direct the court to reduce the award for medical expenses by Dr. Baim's charges of $293; we affirm in all other respects.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

---

[6] Dr. Guten testified that his assessment was based on anatomical and not functional disability. He explained the difference by comparison with basketball star, Michael Jordan. If Jordan sustained a two-percent anatomical disability to a knee, it might result in a one-hundred percent disability functionally as a professional player.